CHOCTAW NATION ET AL. *v.* OKLAHOMA ET AL.

No. 41.    Argued October 22–23, 1969—Reargued March 5, 1970—
Decided April 27, 1970*

*Lon Kile* argued the cause for petitioners in No. 41 on the original argument and on the reargument.    With him on the briefs was *J. D. McLaughlin*.    *Peyton Ford* argued the cause for petitioner in No. 59 on the original argument and on the reargument.    With him on the briefs were *Michael S. Yaroschuk, Andrew C. Wilcoxen, Earl Boyd Pierce,* and *Paul M. Niebell.*

*M. Darwin Kirk* and *G. T. Blankenship,* Attorney General of Oklahoma, argued the cause for respondents in both cases on the reargument.    *Mr. Kirk* argued the cause for respondents in both cases on the original argument.    With them on the brief were *David O. Cordell, Riley B. Fell, Julien B. Fite, N. A. Gibson, S. M. Groom, Jr., Oscar L. Hasty, William P. McClure, Heartsill Ragon, Robert W. Richards, Varley H. Taylor, S. W. Wells,* and *Judson S. Woodruff.*

---

*Together with No. 59, *Cherokee Nation or Tribe of Indians in Oklahoma* v. *Oklahoma et al.,* also on petition for writ of certiorari to the same court.

*Louis F. Claiborne* argued the cause for the United States as *amicus curiae* urging reversal in both cases on the original argument and on the reargument. With him on the brief were *Solicitor General Griswold, Assistant Attorney General Kashiwa, Roger P. Marquis,* and *Frank B. Friedman.*

*Charles A. Hobbs* filed a brief for Wilkinson, Cragun & Barker as *amicus curiae* urging reversal in both cases.

MR. JUSTICE MARSHALL delivered the opinion of the Court.

These cases involve a dispute over the title to land underlying the navigable portion of parts of the Arkansas River in the State of Oklahoma. As a practical matter, what is at stake is the ownership of the minerals beneath the river bed and of the dry land created by navigation projects that are narrowing and deepening the river channel.

In December 1966, petitioner Cherokee Nation brought suit in the United States District Court for the Eastern District of Oklahoma against the State of Oklahoma and various corporations to which the State had leased oil and gas and other mineral rights. In its complaint, the Cherokee Nation sought both to recover the royalties derived from the leases and to prevent future interference with its property rights, claiming that it had been since 1835 the absolute fee owner of certain land below the mean high water level of the Arkansas River. Subsequently, petitioners Choctaw and Chickasaw Nations sought and were granted leave to intervene in the case in order to present their claims that part of the river bed belongs to them.

After pre-trial proceedings in the District Court, a judgment on the pleadings was entered against petitioners and in favor of the State. The District Court held that land grants made to petitioners by the United

States conveyed no rights to the bed of the navigable portion of the Arkansas River. The court thus held that title to the river bed remained in the United States until 1907, when it passed to the State upon Oklahoma's admission to the Union. On appeal, the United States Court of Appeals for the Tenth Circuit affirmed the judgment of the District Court. 402 F. 2d 739 (1968). We granted certiorari, 394 U. S. 972 (1969), to consider petitioners' claims that they received title to the land in question by treaties with the United States in 1830 and 1835.

I

At the outset, we note that these cases require us to pass upon the effect of treaties that were entered into nearly a century and a half ago. As background, it is necessary briefly to relate the circumstances by which petitioners received large grants of land by treaty from the United States.

The history behind these treaties goes back at least to the period immediately after the Revolutionary War and prior to the adoption of the Constitution—a time when petitioners and other Indian Nations occupied much of what are today the southern and southeastern parts of the United States. In 1785, in the Treaty of Hopewell, November 28, 1785, 7 Stat. 18, the United States entered into a treaty of peace and friendship with the Cherokee Indians which established the boundaries of the Cherokee Nation and in which the Indians acknowledged themselves to be under the protection of the United States. The next year, a similar treaty was concluded between the Choctaws and the United States. Treaty of Hopewell, January 3, 1786, 7 Stat. 21.

In following years, the United States entered into a number of additional treaties with both the Chero-

kees and Choctaws.[1] By means of these treaties, the United States purchased large areas of land from the Indians to provide room for the increasing numbers of new settlers who were encroaching upon Indian lands during their westward migrations. Although the Indians were not considered to own the fee title to the land on which they lived, they did have the right to the exclusive use and occupancy of the land— a right that could be ceded only to the United States.[2] Moreover, the Indians continued to live on the land not ceded under their own laws and way of life, and their rights to those lands were "solemnly" guaranteed by the United States. Treaty of Holston, July 2, 1791, 7 Stat. 39, 40; see Indian Intercourse Act of 1802, 2 Stat. 139.

Even while it was making this solemn guarantee, however, the United States adopted a policy aimed at completely extinguishing these Indian Nations' rights to their native lands. The United States had acquired a large western territory in 1803 by the Louisiana Purchase, and it was soon proposed that the Indians be relocated on new lands west of the Mississippi.[3] For a time, it seemed that the westward removal of the Indians might be readily accomplished. In the Treaty of July 8, 1817, 7 Stat. 156, the Cherokee Nation agreed to trade part of its lands in Georgia for a large amount

---

[1] E. g., Treaty of October 2, 1798, 7 Stat. 62; Treaty of December 17, 1801, 7 Stat. 66; Treaty of October 25, 1805, 7 Stat. 93.

[2] See Johnson v. McIntosh, 8 Wheat. 543 (1823); Fletcher v. Peck, 6 Cranch 87, 142–143 (1810).

[3] See Act of March 26, 1804, § 15, 2 Stat. 289. In 1802, even before it had acquired new lands west of the Mississippi, "the United States agreed to extinguish Indian title within the limits of the States as soon as it could be done 'peaceable [sic] and on reasonable terms.'" U. S. Interior Dept., Federal Indian Law 180–181 (1958).

of land in the Arkansas Territory. See also Treaty of February 27, 1819, 7 Stat. 195. Thereafter, a number of the Cherokees left their eastern lands and traveled west. Three years later, in the Treaty of Doak's Stand, October 18, 1820, 7 Stat. 210, the Choctaw Nation agreed to exchange approximately half of its remaining Mississippi lands for a large tract of land in the Arkansas Territory and an even larger one farther west.

Before the United States could relocate the Indians on these new lands, however, at least part of the land that had been set aside in the Arkansas Territory was already settled. It was apparent that the westward removal had not been aimed far enough west to escape the new nation's expansion. By the Treaty of January 20, 1825, 7 Stat. 234, the Choctaws were persuaded to cede back to the United States the eastern portion of the land given them in the Treaty of Doak's Stand. Similarly, the Cherokees who had voluntarily moved to Arkansas agreed to move again—farther west to a new tract of land, "a permanent home, and which shall, under the most solemn guarantee of the United States, be, and remain, theirs forever." Treaty of May 6, 1828, 7 Stat. 311.

The prospect of the voluntary removal of the Indians to land west of the Mississippi soon disappeared. For the most part, the Choctaws and the Cherokees who had not already left their eastern lands refused to give up the land that had long been their home. The abortive attempt to set aside Arkansas Territory land for the Indians justifiably made many of them doubt that the United States would protect them in their new lands. But at the same time the Indians were deciding to remain, the new settlers' expansion and desire for their lands increased. In Georgia, the state legislature, tired of waiting for the United States to fulfill its

promise to extinguish Indian rights to Georgia lands,[4] asserted jurisdiction over the Cherokees and prepared to distribute the Cherokee lands. Mississippi soon followed suit, abolishing tribal government and extending its laws to Choctaw territory.

A clash between the obligation of the United States to protect Indian property rights on the one hand and the policy of forcing their relinquishment on the other was inevitable. With the passage of the Indian Removal Act of 1830, 4 Stat. 411, it became apparent that policy, not obligation, would prevail. In spite of the promises to protect the Indians' land and sovereignty, it was clear that the United States was unable or unwilling to prevent the States and their citizens from violating Indian rights.

Thus faced with the prospect of losing both their lands and way of life, the Choctaws agreed in 1830 to leave Mississippi and to move to new lands west of the Arkansas Territory. As a guarantee that they would not again be forced to move, the United States promised to convey the land to the Choctaw Nation in fee simple "to inure to them while they shall exist as a nation and live on it." In addition, the United States pledged itself to secure to the Choctaws the "jurisdiction and government of all the persons and property that may be within their limits west, so that no Territory or State shall ever have a right to pass laws for the government of the Choctaw Nation . . . and that no part of the land granted to them shall ever be embraced in any Territory or State." Treaty of Dancing Rabbit Creek, Sept. 27, 1830, 7 Stat. 333–334.

The Cherokees were at first determined to retain the Georgia lands on which they had by that time settled

---

[4] See n. 3, *supra.*

down, establishing farms and towns.[5] However, after a time, they, too, were forced to leave. In the Treaty of New Echota, December 29, 1835, 7 Stat. 478, the Cherokees who had remained in the East agreed to leave their lands and to join the Cherokees who had already moved west of the Mississippi. Once again, the United States assured the Indians that they would not be forced to move from their new lands: a patent would issue to convey those lands in fee simple, and they would never be embraced within the boundaries of any State or Territory.

The United States thus succeeded in its efforts to remove the Indians from their eastern lands. In exchange, by the Treaty of Dancing Rabbit Creek with the Choctaws in 1830 and the Treaty of New Echota with the Cherokees in 1835, the United States granted a vast area of its western territory to the two Indian Nations. The land thus granted to the Choctaws encompassed what is today approximately the southern third of the State of Oklahoma; to the north, the Cherokees received title to a tract of land in the eastern part of the remainder of the State with a perpetual outlet to and other rights in land farther west.

Although by later treaties other Indian tribes were settled on parts of the land originally included in these grants, and the Chickasaw Nation was granted an undivided one-fourth interest in the remainder of the Choctaw land, see Treaty of January 17, 1837, 11 Stat. 573; Treaty of June 22, 1855, 11 Stat. 611, the fee

---

[5] The efforts on behalf of the Cherokees remaining in Georgia included two cases that were brought to this court, *Cherokee Nation* v. *Georgia*, 5 Pet. 1 (1831), and *Worcester* v. *Georgia*, 6 Pet. 515 (1832). For a recent account of these and other Cherokee efforts, see Burke, The Cherokee Cases: A Study in Law, Politics, and Morality, 21 Stan. L. Rev. 500 (1969). See generally Federal Indian Law, *supra*, n. 3, at 180–200.

simple title to a vast tract of land continued to be held by the petitioner Indian Nations for well over half a century.

Then, again due in large part to the pressure of settlers who were encroaching on Indian lands,[6] Congress acted to change the arrangement. By § 16 of the Act of March 3, 1893, 27 Stat. 645, a commission was created to negotiate with the Indian tribes that had been located in Oklahoma on the allotment of land to their individual members in preparation for the final dissolution of the tribes. Thereafter, the Indians—including the Choctaws, Chickasaws, and Cherokees—agreed to the allotment of their lands and the termination of tribal affairs. See Act of June 28, 1898, 30 Stat. 495; Act of July 1, 1902, 32 Stat. 716. Finally, Congress provided for the disposition of all petitioners' lands with the provision that any remaining tribal property "be held in trust by the United States for the use and benefit of the Indians." Act of April 26, 1906, § 27, 34 Stat. 148. The way was thus paved for Oklahoma's admission to the Union "on an equal footing with the original States," conditioned on its disclaimer of all right and title to lands "owned or held by any Indian, tribe, or nation." Act of June 16, 1906, §§ 3, 4, 34 Stat. 270, 271.

According to petitioners, they received title to the bed of the Arkansas River by treaty and patent from the United States. Because the land was not individually allotted or otherwise disposed of pursuant to the 1906 Act, title remained in petitioners or passed to the United States to be held in trust for them. The State, on the other hand, claims that petitioners never received title to the land. The courts below held in favor of the State, thus disposing of the case since it was undis-

---

[6] See *Marlin* v. *Lewallen,* 276 U. S. 58, 61 (1928); *Choate* v. *Trapp,* 224 U. S. 665, 667–668 (1912).

puted that if title remained in the United States, it passed to Oklahoma upon admission to the Union as an incident of statehood. The sole question for review then is whether the treaty grants from the United States conveyed title to the bed of the Arkansas River to the Cherokee and Choctaw Nations.

## II

We move then to the construction and effect of the treaties between petitioners and the United States. At the outset, the State argues that the bed of the Arkansas River was not included in the grants to petitioners even by the accepted standards of ordinary conveyancing since to a skilled draftsman "the land descriptions in the treaties, standing alone, actually exclude the river beds."

Part of the Arkansas River here in question is surrounded on both sides by land granted to the Cherokees, and with regard to it the argument is at the least strained. There is no explicit exclusion of the river bed in the 1835 Treaty of New Echota; in fact, there is no reference at all to the river from "a point where a stone is placed opposite the east or lower bank of Grand river at its junction with the Arkansas" to its junction with the Canadian. See 7 Stat. 480. As we read the Cherokee treaties and the patent issued thereunder by the President, the Cherokee Nation was granted one undivided tract of land described merely by exterior metes and bounds. That portion of the Arkansas River between its junctions with the Grand and Canadian Rivers lies completely within those metes and bounds, and all of the land inside those boundaries including the river bed seems clearly encompassed within the grant.

Below its confluence with the Canadian, the Arkansas River forms the boundary between the land granted to the Cherokees to the north and the Choctaws to the south, and the treaties do explicitly refer to this portion

of the river. In the Treaty of Doak's Stand in 1820, petitioner Choctaw Nation was granted all the land within the following boundaries:

> "*Beginning on the Arkansas River,* where the lower boundary line of the Cherokees strikes the same; thence *up the Arkansas to the Canadian Fork,* and up the same to its source; thence due South to the Red River; thence down Red River, three miles below the mouth of Little River, which empties itself into Red River on the north side; thence a direct line to the beginning." 7 Stat. 211. (Emphasis added.)

Ten years later, this grant was superseded by the Treaty of Dancing Rabbit Creek, which "varied the description a little and provided for a special patent," *Fleming* v. *McCurtain,* 215 U. S. 56, 59 (1909):

> "*beginning near Fort Smith where the Arkansas boundary crosses the Arkansas River, running thence to the source of the Canadian fork;* if in the limits of the United States, or to those limits; thence due south to Red River, and down Red River to the west boundary of the Territory of Arkansas; thence north along that line to the beginning." 7 Stat. 333. (Emphasis added.)

And the patent issued to the Choctaw Nation in 1842 by President Tyler merely repeated the language of this latter treaty.

The Choctaw treaties preceded any grant to the Cherokee Nation; and, under them, petitioners Choctaw and Chickasaw Nations claim the entire bed of the Arkansas River between its confluence with the Canadian River and the Oklahoma-Arkansas border. The Cherokees, however, also have a claim to this part of the river, based on the language setting out the southern border of the

land granted them in the Treaty of New Echota: From a point on the Canadian River,

> "thence down the Canadian to the Arkansas; thence *down the Arkansas* to that point on the Arkansas where the eastern Choctaw boundary strikes said river . . . ."   7 Stat. 480.   (Emphasis added.)

Moreover, they point to the patent issued them by President Van Buren in 1838, which described the southern boundary of their lands as follows:

> "down the Canadian river on its north bank to its junction with Arkansas river; thence *down the main channel of Arkansas river* to the western boundary of the State of Arkansas at the northern extremity of the eastern boundary of the lands of the Choctaws on the south bank of Arkansas river . . . ."   (Emphasis added.)

According to the Cherokee Nation, the United States thereby conveyed to it the north half of the Arkansas River from its junction with the Canadian to the eastern Oklahoma border.   Petitioners thus are in disagreement about the effect of the words in the treaties and patents with regard to this lower portion of the river.[7]

That disagreement, however, does nothing to make convincing even the State's argument that this part of the river bed was excluded from the grants as a matter of conveyancing law.   About all that can be said about the treaties from the standpoint of a skilled draftsman is that they were not skillfully drafted.   More important is the fact that these treaties are not to be considered as exercises in ordinary conveyancing.   The Indian Nations did not seek out the United States and agree upon an exchange of lands in an arm's-length transaction.

---

[7] The courts below did not resolve the dispute between petitioners, and we likewise do not pass on that question.

Rather, treaties were imposed upon them and they had no choice but to consent. As a consequence, this Court has often held that treaties with the Indians must be interpreted as they would have understood them, see, *e. g.,* *Jones* v. *Meehan,* 175 U. S. 1, 11 (1899), and any doubtful expressions in them should be resolved in the Indians' favor. See *Alaska Pacific Fisheries* v. *United States,* 248 U. S. 78, 89 (1918). Indeed, the Treaty of Dancing Rabbit Creek itself provides that "in the construction of this Treaty wherever well founded doubt shall arise, it shall be construed most favourably towards the Choctaws." 7 Stat. 336.

Applying these principles here, we conclude that the entire Arkansas River below its confluence with the Grand River was within the metes and bounds of the treaty grants to petitioners. The State argues that the treaty terms "up the Arkansas" and "down the Arkansas" should be read to mean "along the bank of the Arkansas River." However, the United States was competent to say the "north side" or "bank" of the Arkansas River when that was what it meant, as it had in the 1817 grant to the Cherokees in the Arkansas Territory. See 7 Stat. 158. Even more damaging to the State's argument is the contemporaneous interpretation of the treaty language by the President as reflected in the specific language of the Cherokee patent, "down the Canadian river on its north bank to its junction with Arkansas river; thence *down the main channel of Arkansas river.*" [8]

---

[8] This construction of the treaty term "down the Arkansas" indicates that at the minimum the boundary of the Choctaws was also the middle of the main channel. Congress was accustomed to using the terms "up" or "down" the river when designating a navigable river as the boundary between States, see, *e. g.,* Act of March 2, 1819, § 2, 3 Stat. 490 (Alabama); Act of February 20, 1811, § 1, 2 Stat. 641 (Louisiana); and, when it did so, the boundary was set as the middle of the main channel. See *Arkansas* v.

(Emphasis added.) According to the State, the italicized part of this description should be read to mean "down the north bank of the main branch of the Arkansas River." However, not only does this reading itself seem to include part of the river bed—that underlying the "secondary" branches—but it also conflicts with this Court's interpretation of the term in *Brewer-Elliott Oil & Gas Co.* v. *United States,* 260 U. S. 77 (1922).

The facts involved in *Brewer-Elliott* were essentially similar to those of the present cases. There the United States had established a reservation for the Osage Indians which was bounded on one side by "the main channel of the Arkansas river." 260 U. S., at 81. The United States brought suit to establish the Indians' right to the river bed and the oil reserves beneath it, and the State of Oklahoma intervened to claim that the river bed had passed to it at statehood. The case came

---

*Mississippi,* 250 U. S. 39 (1919); *Iowa* v. *Illinois,* 147 U. S. 1 (1893).

Given this congressional usage, it seems natural for the President, on whose behalf the treaties had been negotiated, to have given the same interpretation to identical language in the analogous situation involving the boundary between petitioners Choctaw and Cherokee Nations, which had long been considered sovereign entities. In fact, this Court recognized the analogy in *Barney* v. *Keokuk,* 94 U. S. 324, 337 (1877), a case involving a grant bounded by the Mississippi River, when it quoted with apparent approval the following language from *Haight* v. *City of Keokuk,* 4 Iowa 199, 213 (1856): "The grant to the [Indians] was to them as persons, and not as a political body. The political jurisdiction remained in the United States. Had the grant been to them as a political society, it would have been a question of boundary between nations or states, and then the line would have been the *medium filum aquæ,* as it is now between Iowa and Illinois." The grants to petitioners were undoubtedly to them as "a political society," and any "well founded doubt" regarding the boundaries must, of course, be resolved in their favor.

here after the Court of Appeals had held that "whether the river was navigable or non-navigable, the United States, as the owner of the territory through which the Arkansas flowed before statehood, had the right to dispose of the river bed, and had done so, to the Osages." *Id.*, at 80. This Court held that in the region in question the Arkansas River was nonnavigable and that "the title of the Osages as granted certainly included the bed of the river as far as the main channel, because the words of the grant *expressly carry the title to that line.*" *Id.*, at 87. (Emphasis added.) The question whether it would have been beyond the power of the United States to make the grant had the river been navigable was reserved for future decision.

In the present cases, there is no question that the Arkansas River is navigable below its junction with the Grand River.[9] However, we do not understand the State to argue the question reserved in *Brewer-Elliott.* Indeed, it seems well settled that the United States can dispose of lands underlying navigable waters just as it can dispose of other public lands. See *Shively* v. *Bowlby*, 152 U. S. 1, 47–48 (1894). Rather, the question is whether the United States intended to convey title to the river bed to petitioners. See *Alaska Pacific Fisheries* v. *United States, supra*, at 87; *Moore* v. *United States*, 157 F. 2d 760, 763 (C. A. 9th Cir. 1946); cf. *Donnelly* v. *United States*, 228 U. S. 243, 259 (1913).

Turning then to that question, we think it clear, as did the Court of Appeals, that the parties to the treaties

---

[9] The District Court took judicial notice of the navigability at all relevant times of those portions of the Arkansas River in question, and that issue is not in dispute here. In the *Brewer-Elliott* case, this Court affirmed the finding of the District Court that "the head of navigation is and was the mouth of the Grand River." 260 U. S., at 86.

and patents did not pause specifically to provide for the ownership of the river bed. According to the State—even if the river bed was within the bounds of the grants to petitioners—we need look no further because "disposals by the United States during the territorial period are not lightly to be inferred, and should not be regarded as intended unless the intention was definitely declared or otherwise made very plain." *United States* v. *Holt State Bank*, 270 U. S. 49, 55 (1926). Even were we limited to the treaties and patents alone, the most specific language of those instruments is identical to that which we said "expressly" conveyed title to the river bed in *Brewer-Elliott*. However, nothing in the *Holt State Bank* case or in the policy underlying its rule of construction (see *Shively* v. *Bowlby, supra*, at 49–50) requires that courts blind themselves to the circumstances of the grant in determining the intent of the grantor. Indeed, the court in *Holt State Bank* itself examined the circumstances in detail and concluded "the reservation was not intended to effect such a disposal." 270 U. S., at 58. We think that the similar conclusion of the Court of Appeals in this case was in error, given the circumstances of the treaty grants and the countervailing rule of construction that well-founded doubt should be resolved in petitioners' favor.

Together, petitioners were granted fee simple title to a vast tract of land through which the Arkansas River winds its course. The natural inference from those grants is that all the land within their metes and bounds was conveyed, including the banks and bed of rivers. To the extent that the documents speak to the question, they are consistent with and tend to confirm this natural reading. Certainly there was no express exclusion of the bed of the Arkansas River by the United States as there was to other land within the grants.

As a practical matter, reservation of the river bed would have meant that petitioners were not entitled to enter upon and take sand and gravel or other minerals from the shallow parts of the river or islands formed when the water was low. In many respects however, the Indians were promised virtually complete sovereignty over their new lands. See *Atlantic & Pacific R. Co.* v. *Mingus,* 165 U. S. 413, 435–436 (1897). We do not believe that petitioners would have considered that they could have been precluded from exercising these basic ownership rights to the river bed, and we think it very unlikely that the United States intended otherwise. Nor do we believe that the United States would intend that it rather than petitioners have title to the dry bed left from avulsive changes of the river's course, which as the District Court noted are common in this area. Indeed, the United States seems to have had no present interest in retaining title to the river bed at all; it had all it was concerned with in its navigational easement via the constitutional power over commerce. Cf. *Pollard* v. *Hagan,* 3 How. 212, 229 (1845).

Finally, it must be remembered that the United States accompanied its grants to petitioners with the promise that "no part of the land granted to them shall ever be embraced in any Territory or State." In light of this promise, it is only by the purest of legal fictions that there can be found even a semblance of an understanding (on which Oklahoma necessarily places its principal reliance), that the United States retained title in order to grant it to some future State.

We thus conclude that the United States intended to and did convey title to the bed of the Arkansas River below its junction with the Grand River within the present State of Oklahoma in the grants it made to peti-

tioners. The judgments of the Court of Appeals are therefore reversed, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE HARLAN took no part in the consideration or decision of these cases.

MR. JUSTICE DOUGLAS, concurring.

While I join the Court's opinion, I add a few words.

The Cherokees, pursuant to treaties with the United States, exchanged their aboriginal domain in the East for more than 14,000,000 acres of land west of the Mississippi, then in Indian Territory but now a part of Oklahoma. Pursuant to promises in the treaties, the United States on December 31, 1838, issued a patent to the Cherokees describing the lands by metes and bounds and conveying the lands here in question in fee simple.[1]

A portion of the Arkansas River is entirely within the grant to the Cherokees. It is therefore a mystery why all of the bed in that portion of the river was not conveyed to the Cherokees. The river bed was not reserved to the United States by the patent. The United States, however, made other reservations: (1) the right to permit other tribes to get salt on the western part of the grant; (2) any rights to lands assigned the Quapaws which turned out to be within the bounds of these Cherokee lands; (3) the right to establish and maintain military posts and roads together with the free use of land, timber, fuel, and materials for the construction and support of

---

[1] In addition to the millions of acres conveyed to the Cherokees in fee simple, which included the land surrounding the segment of the Arkansas River here in question, they were guaranteed lands to the west of that tract as "a perpetual outlet west" which provided for "free and unmolested use" of those lands.

those facilities. Since the United States made some reservations but made no reservations of the river bed, and if fair dealing is the standard, one would conclude, I think, that the river bed was the tail that went with the hide.

As respects the Choctaws, another section of the Arkansas River was the boundary between the Choctaw and the Cherokee grants. Whatever may be the rights between the Cherokees and the Choctaws, it seems clear to me that since one portion of the Arkansas was within the exterior boundaries of the Cherokee grant and another portion was within the exterior boundaries of the Choctaw grant, the river bed of each of those segments went to the respective grantees in fee simple.

Here an entire region was conveyed to these tribes as part of their resettlement,[2] with assurances of self-

---

[2] The details of the removal of the Cherokees from their ancestral lands are related in *Western Cherokee Indians* v. *United States,* 27 Ct. Cl. 1, 20 *et seq.* While 6,000 had moved west to their new lands by 1838, 18,000 were still in their ancestral homes.

"The Eastern Cherokees were prisoners in Georgia, under the guard of 5,000 United States soldiers, who had hunted them down from their mountains and driven them out of their valleys and were now bringing them to the terms of an enforced emigration." *Id.,* at 20.

They were finally forcibly removed by the U. S. Army under General Scott:

"He moved quickly and successfully, and has thus recorded the most painful experience of his military life:

" 'Food in abundance had been provided at the depots, and wagons accompanied every detachment of troops. The Georgians distinguished themselves by their humanity and tenderness. Before the first night thousands—men, women, and children, sick and well— were brought in. Poor creatures. They had obstinately refused to prepare for the removal. Many arrived half starved, but refused the food that was pressed upon them. At length the children, with less pride, gave way, and next their parents. The Georgians were the waiters on the occasion, many of them with flowing tears. The

government [3] and with pledges that their new homelands would never be part of any State.[4] They were indeed constituted as the sovereign autonomy established in lieu of a prospective State.[5]

The title held by these tribes was not the usual aboriginal Indian title of use and occupancy but a fee simple, cf. *United States* v. *Creek Nation,* 295 U. S. 103, terminable if and when these Indian nations ceased to exist

---

autobiographer has never witnessed a scene of deeper pathos.'" *Id.,* at 23.

For early incidents involving this Court in aspects of the removal problems see M. James, Andrew Jackson: Portrait of a President 280–281, 304–305 (1937); 1 C. Warren, Supreme Court in U. S. History, c. 19 (1937); *Worcester* v. *Georgia,* 6 Pet. 515.

[3] Our agents said the following to the Cherokee Council on July 31, 1837: "Here you are subjected to laws, in the making of which you have no voice; laws which are unsuited to your customs, and abhorrent to your ideas of liberty. There, Cherokees, you will make laws for yourselves, and establish such government as in your own estimation may be best suited to your condition. There, Cherokees, in your new country, you will be far beyond the limits or jurisdiction of any State or Territory. The country will be yours; yours exclusively. No other people can make claim to it, and you will be protected by the vigilant power of the United States against the intrusion of the white man." S. Doc. No. 120, 25th Cong., 2d Sess., 988.

[4] The Treaty with the Cherokees of December 29, 1835, 7 Stat. 478, provided in Article 5 that no lands conveyed shall without the consent of the Cherokees ever "be included within the territorial limits or jurisdiction of any State or Territory." And see Article IV of the Treaty of Sept. 27, 1830, 7 Stat. 333.

[5] The Treaty with the Cherokees of May 6, 1828, 7 Stat. 311, spoke of the desire of the United States to provide the Cherokees "*a permanent* home, and which shall, under the most solemn guarantee of the United States, be, and remain, theirs forever—a home that shall never, in all future time, be embarrassed by having extended around it the lines, or placed over it the jurisdiction of a Territory or State, nor be pressed upon by the extension, in any way, of any of the limits of any existing Territory or State."

or abandoned the territory—conditions not yet occurring. The reliance by the Court of Appeals on *United States* v. *Holt State Bank,* 270 U. S. 49, was therefore misplaced as that case involved only the aboriginal Indian title of use and occupancy. *Id.,* at 58–59.

The United States, speaking through the Solicitor General, has filed a brief *amicus* taking that position in these cases and maintaining it vigorously on oral argument. It concedes, as it must in light of *Shively* v. *Bowlby,* 152 U. S. 1, 49–50, that while the United States holds a domain as a territory, it may convey away the right to the bed of a navigable river, not retaining that property for transfer to a future State, though as stated in *Holt State Bank* that purpose is "not lightly to be inferred, and should not be regarded as intended unless the intention was definitely declared or otherwise made very plain." 270 U. S., at 55. Such exceptional circumstances are present here.

The treaties with the present Indians solemnly assured them that these new homelands would never be made part of a State or Territory. So it is reasonable to infer that the United States did not have a plan to hold this river bed in trust for a future State. As the United States says, we would have to indulge "a cynical fiction without any basis in fact" to attribute such a purpose to the parties. Sixty years later, however, Congress was intent in creating a State out of these lands.[6]

---

[6] The story of the exploitation of Indians by state and local agencies has been recently summarized by William Brandon:

"Termination is truly a word of ill omen to tribal Indians. Its meaning in Indian affairs is the termination of 'Federal responsibility,' the responsibility of the Federal Government to act as trustee for Indian lands, rights, and resources; the responsibility to protect Indian groups in these rights and possessions—protect them particularly against states, counties, cities, or other local powers

Friction between the Indians and the whites who sought to settle on these lands mounted. As time passed the American attitude towards these treaties became as hostile as the opinion below. The Commissioner of Indian Affairs in his 1886 Report spoke of the exploitation of many Indians by a few Indians who had a monopoly of land and he attacked the treaties as such:

"[I]t is perfectly plain to my mind that the treaties never contemplated the un-American and absurd

---

that might divest them of their rights and possessions—and to provide certain services such as education and health.

"These responsibilities are based upon treaty promises or other equally legal commitments, in which the Federal Government pledged, in return for cessions of value, to render unto specific Indian groups specific rights and their protection, plus the provision of schools, hospitals, sawmills, teachers, doctors, tools and implements, roads, supplies when needed—all the services of the modern world, to be supplied and administered by the Federal Government rather than administered under state and local jurisdictions, because of well-founded apprehensions that state and local jurisdictions might not be trustworthy in carrying out such promises." Progressive, January 1970, p. 38.

E. Cahn, Our Brother's Keeper 21 (1969), states the same theme:

"The Indian knows that termination takes many forms. He can be flooded out of his reservation; he can be relocated; his reservation can be sold out from under him if he cannot meet taxes to which it is subject. His limited power to protect himself on the reservation from local prejudice and discrimination can be wiped away by the substitution of state laws for tribal law, and state jurisdiction for tribal jurisdiction. All of these, the Indian knows, are variants on one basic truth: the United States Government does not keep its promises. Sometimes it breaks them all at once, and sometimes slowly, one at a time. The result is the same—termination. When the Indian is asked to forsake his status under the Bureau in exchange for cash, for promises of technical aid, for public works improvements and industrial developments, he has learned to expect two things:

"—That the promises will not be kept.

"—That even if they should be kept, they will prove inadequate to maintain the Indian at even his reservation level of deprivation."

idea of a separate nationality in our midst, with power as they may choose to organize a government of their own, or not to organize any government nor allow one to be organized, for the one proposition contains the other. These Indians have no right to obstruct civilization and commerce and set up an exclusive claim to self-government, establishing a government within a government, and then expect and claim that the United States shall protect them from all harm, while insisting that it shall not be the ultimate judge as to what is best to be done for them in a political point of view. I repeat, to maintain any such view is to acknowledge a foreign sovereignty, with the right of eminent domain, upon American soil—a theory utterly repugnant to the spirit and genius of our laws, and wholly unwarranted by the Constitution of the United States." H. R. Exec. Doc. No. 1, pt. 5, 49th Cong., 2d Sess., 87.

But cf. the views of Robert L. Owen, U. S. Indian Agent, in H. R. Exec. Doc. No. 1, pt. 5, vol. 2, 50th Cong., 2d Sess., 134–135 (1888). And see A. Debo, The Rise and Fall of the Choctaw Republic 245 *et seq.* (1934).

A commission was created to negotiate an agreement with these tribes superseding the earlier treaties, all as related in *Choate* v. *Trapp,* 224 U. S. 665, 667–670. An agreement was in time reached whereby tribal lands were allotted to individual members of the tribe, with any remaining tribal land passing to the United States as trustees for the Indians. 34 Stat. 137. The bed of the Arkansas was not allotted. The next year—1907— Oklahoma was admitted to the Union on an equal footing with the original States. 34 Stat. 267. Certainly this cession by the tribes of their interest in the river bed of the Arkansas to the United States in trust for

their members was no possible vehicle for transferring that title to Oklahoma.[7]

The Court properly makes these cases candidates for application of the classic rule that treaties or agreements with Indians are to be construed in their favor, not in favor of commercial interests that repeatedly in our history have sought to exploit them. The idea was perhaps best stated in *United States* v. *Winans,* 198 U. S. 371, 380–381:

> "[W]e will construe a treaty with the Indians as 'that unlettered people' understood it, and 'as justice and reason demand in all cases where power is exerted by the strong over those to whom they owe care and protection,' and counterpoise the inequality 'by the superior justice which looks only to the substance of the right without regard to technical rules.' 119 U. S. 1; 175 U. S. 1. How the treaty in question was understood may be gathered from the circumstances."

We should therefore resolve any doubts in these cases in favor of these Indians, mindful of what President Jackson said at a meeting with the Choctaws and Chickasaws:

> "Brothers, listen: the only plan by which this can be done, and tranquillity for your people obtained, is, that you pass across the Mississippi to a country in all respects equal, if not superior, to the one you have. Your great father will give

---

[7] The Cherokee Nation claims to have negotiated some 13 sand and gravel leases for the bed of the Arkansas River between April 12, 1883, and May 27, 1893—prior to the admission of Oklahoma into the Union. The record does not disclose the date when the State of Oklahoma first assumed the role of lessor of the river bed, although several cases have involved such leases by the State. See, *e. g., Lynch* v. *Clements,* 263 P. 2d 153.

it to you for ever, that it may belong to you and your children while you shall exist as a nation, free from all interruption.

.    .    .    .    .

"Peace invites you there; annoyance will be left behind; within your limits, no State or territorial authority will be permitted; intruders, traders, and above all, ardent spirits, so destructive to health and morals, will be kept from among you, only as the laws and ordinances of your nation may sanction their admission."   S. Doc. No. 512, 23d Cong., 1st Sess., Vol. 2, 240–242.

Only the continuation of a regime of discrimination against these people,[8] which long plagued the relations between the races, can now deny them this just claim.

MR. JUSTICE WHITE, with whom THE CHIEF JUSTICE and MR. JUSTICE BLACK join, dissenting.

At issue in these cases is the ownership of the lands underlying the Arkansas River from its confluence with the Grand River in Oklahoma downstream to the western border of Arkansas.   The Arkansas River is a navigable stream below, but not above, its junction with the Grand River.   The contending parties are three Indian tribes on the one hand and the State of Oklahoma on the other. The Cherokees base their claim on a United States patent of 1838 and underlying treaties, the Choctaws and the

---

[8] Sequoyah, the great Cherokee from Tennessee, whose home stood on the banks of the Little Tennessee River, was crippled for life on a hunting trip; and in his inactive life thereafter invented the Cherokee syllabary, inspired by the "talking leaves" or written and printed pages by which the whites communicated.   His syllabary contains some 80 syllables in the Cherokee language.   His memory is perpetuated in the name of the *genus* of California giant redwoods and his statue was placed in Statuary Hall of the National Capitol in 1917.

Chickasaws on an 1842 patent also issued in fulfillment of prior treaty commitments. The State claims under the settled doctrine that a newly admitted State takes title to the beds of all navigable rivers within its borders; the State denies that the prior patents conveyed the river bed. The patent to the Cherokees included property on both sides of the Arkansas River from its confluence with the Grand River downstream to its junction with the Canadian River. From the Canadian River to the Arkansas border, the Arkansas River was the boundary between Cherokee lands on the north side and the Choctaw lands on the south.

According to the Court, the Indians became the owners of all of the river bed from the Grand River to the Arkansas border: the river bed between the Grand River and the Canadian River is Cherokee property because the metes and bounds description of the grant crossed the river without purporting to exclude the river bed; the remaining portion of the river bed is said to be Indian property because by ordinary conveyancing standards the relevant patents and treaties reveal an intent by the United States to convey the river bed to the tribes. I differ with the Court as to both portions of the river bed.

## I

As far as riparian rights are concerned—and for other purposes too—the policy and applicable laws of the United States have always distinguished between navigable and nonnavigable streams. Section 931 of Title 43 of the United States Code, Rev. Stat. § 2476, which dates from 1796, does so unmistakably:

> "All navigable rivers, within the territory occupied by the public lands, shall remain and be deemed public highways; and, in all cases where the opposite banks of any streams not navigable belong to

different persons, the stream and the bed thereof shall become common to both."

The owners of land adjacent to a nonnavigable stream own the river bed, but the surveys of public lands stop with the banks of navigable streams; conveyances by the United States of land located on a navigable river carry no interest in the river bed under federal law. *Railroad Co.* v. *Schurmeir*, 7 Wall. 272, 288–289 (1869), made the difference very clear:

> "[T]he court does not hesitate to decide, that Congress, in making a distinction between streams navigable and those not navigable, intended to provide that the common law rules of riparian ownership should apply to lands bordering on the latter, but that the title to lands bordering on navigable streams should stop at the stream, and that all such streams should be deemed to be, and remain public highways."

*Packer* v. *Bird*, 137 U. S. 661, 672 (1891), is to like effect. *Shively* v. *Bowlby*, 152 U. S. 1, 49–50 (1894), re-emphasized that:

> "The Congress of the United States, in disposing of the public lands, has constantly acted upon the theory that those lands, whether in the interior, or on the coast, above high water mark, may be taken up by actual occupants, in order to encourage the settlement of the country; but that the navigable waters and the soils under them, whether within or above the ebb and flow of the tide, shall be and remain public highways; and, being chiefly valuable for the public purposes of commerce, navigation and fishery, and for the improvements necessary to secure and promote those purposes, shall not be granted away during the period of territorial government; but, unless in case of some in-

> ternational duty or public exigency, shall be held by the United States in trust for the future States, and shall vest in the several States, when organized and admitted into the Union, with all the powers and prerogatives appertaining to the older States in regard to such waters and soils within their respective jurisdictions; in short, shall not be disposed of piecemeal to individuals as private property, but shall be held as a whole for the purpose of being ultimately administered and dealt with for the public benefit by the State, after it shall have become a completely organized community."

The issue in *Shively* was whether the grantee of lands along a navigable river in Oregon Territory had an interest in the river bed by reason of his federal grant. It was held that he did not.

In 1845, *Pollard* v. *Hagan,* 3 How. 212, held that the United States had no power, except where state law permitted, to convey an interest in the bed of a navigable river after the State in which it was located had been admitted to the Union. The Court also implied that because the beds of navigable streams were held in trust for future States, the United States was without power to dispose of the beds prior to statehood. This implication was repudiated by statements in such later cases as *Goodtitle* v. *Kibbe,* 9 How. 471, 478 (1850), and *Shively* v. *Bowlby, supra,* at 47–48. In the words of the latter:

> "We cannot doubt, therefore, that Congress has the power to make grants of lands below high water mark of navigable waters in any Territory of the United States, whenever it becomes necessary to do so in order to perform international obligations, or to effect the improvement of such lands for the promotion and convenience of commerce with for-

eign nations and among the several States, or to carry out other public purposes appropriate to the objects for which the United States hold the Territory." 152 U. S., at 48.

Nevertheless, whether the United States had only a restricted power to convey interests in navigable river beds prior to statehood was deemed an open question in *Brewer-Elliott Oil & Gas Co.* v. *United States,* 260 U. S. 77, 85–86 (1922); decision on that question was reserved as was decision on the issue whether, if the power to convey was limited to certain purposes, provision of a home for an Indian tribe came within one of these permitted purposes. Three years later, *United States* v. *Holt State Bank,* 270 U. S. 49, 55 (1926), again recognized that "the United States early adopted and constantly has adhered to the policy of regarding lands under navigable waters in acquired territory, while under its sole dominion, as held for the ultimate benefit of future States, and so has refrained from making any disposal thereof, save in exceptional instances when impelled to particular disposals by some international duty or public exigency."

The ownership of lands under navigable waters was deemed an incident of sovereignty, *Martin* v. *Waddell,* 16 Pet. 367, 409–411 (1842), and whatever the power of the Federal Government to convey such lands lying in its unorganized territories, Congress never undertook to do so by general laws. *Shively* v. *Bowlby, supra,* at 48–50. Conveyance of a river bed would not be implied and would not be found unless the grant "in terms embraces the land under the waters of the stream," *Packer* v. *Bird, supra,* at 672; *Shively* v. *Bowlby, supra,* at 47–48. Such disposals by the United States "during the territorial period are not lightly to be inferred, and should not be regarded as intended unless the intention

was definitely declared or otherwise made very plain."
*United States* v. *Holt State Bank, supra,* at 55.

## II

Against this doctrinal background, for either the Cherokees, the Choctaws, or the Chickasaws to prevail, there must be found in their grant a "very plain" basis for concluding that the United States intended to convey an interest in the river bed. As I see it, neither the patents nor the treaties here involved satisfy that standard.

The patent to the Choctaws in 1842, which merely quotes from the 1830 Treaty of Dancing Rabbit Creek, 7 Stat. 333, describes the northern boundary of the Choctaw grant as "[b]eginning near fort Smith where the Arkansas boundary crosses the Arkansas river, running thence to the source of the Canadian fork . . . ." An earlier treaty, the 1820 Treaty of Doak's Stand, 7 Stat. 210, described the northern boundary of the Choctaw lands as going "up the Arkansas to the Canadian Fork . . . ." The quoted phrases of the patent (and the Treaty of Dancing Rabbit Creek) and of the Treaty of Doak's Stand are the sole bases for the Choctaw claim to the entire bed of the Arkansas River from the western boundary of Arkansas upstream to the junction with the Canadian River. The Cherokees claim that the conveyance gave the Choctaws only the southern half of the river bed; the State of Oklahoma claims that the northern boundary of the Choctaw lands went up the river on its south bank and hence gave the Choctaws none of the river bed since the river was navigable and there was no express conveyance of the river bed to the Choctaws.

As for the Cherokees, their southern boundary from the Canadian River to the Arkansas border is described in the 1838 patent as proceeding from the north bank of the

Canadian River at its junction with the Arkansas River, "thence down the main channel of Arkansas river to the western boundary of the State of Arkansas, at the northern extremity of the eastern boundary of the lands of the Choctaws, on the south bank of the Arkansas river . . . ." The patent was in execution of three prior treaties. The 1835 Treaty of New Echota, 7 Stat. 478, in describing the land to be conveyed, repeated the description of the Treaty of February 14, 1833, 7 Stat. 414, which was supplemental to the Treaty of May 6, 1828, 7 Stat. 311. The description in the Treaty of New Echota did not contain the "main channel" language later used in the patent; from the Canadian, the southern boundary ran "down the Arkansas to that point on the Arkansas where the eastern Choctaw boundary strikes said river . . . ." The Cherokees claim this language gives them the northern half of the river bed. The Choctaws and the State claim that the Cherokees have no interest in this part of the river bed.

Insofar as the river bed from the Canadian River to the Arkansas border is concerned, the terms of the patents and the treaties are obviously a far cry from what the cases require to evidence the intention of the United States to dispose of lands under a navigable river. But it is said that these cases are irrelevant where the grantee is an Indian tribe and that countervailing considerations require treaties with Indian tribes to be interpreted as the treaties would have been understood by the Indians. Reliance is also placed on the provision in the 1830 Choctaw treaty stating that "wherever well founded doubt shall arise," the treaty shall be construed in favor of the Choctaws. But I find it difficult to conclude from such murky language that the United States intended to reject its historic policy with respect to beds of navigable rivers in executing these treaties and patents. Nor is there any evidence whatsoever that the

Indians of that day would have considered the land under a navigable river to be of any utility to them or as being included in a grant of lands adjacent to the river. Indeed, the Treaty of Dancing Rabbit Creek expressly negatives any inference that the United States was sharing with the Choctaws any of its sovereignty over the navigable portion of the Arkansas River. It provided that "[n]avigable streams shall be free to the Choctaws who shall pay no higher toll or duty than citizens of the U. S."

The Cherokee patent recited that the treaty lands had been surveyed and the description in the patent was taken from the survey. Field notes of an 1831 survey of the eastern Cherokee boundary show unmistakably that the surveyor "fixed, the South East corner of the Cherokee lands" on the north bank of the Arkansas River and that from this point it was "64.50 Ch, to the South bank, where the northern extremity of the Eastern boundary of the Choctaw lands, strikes the Arkansas River."

The Choctaw grant had also been surveyed pursuant to treaties executed prior to the patent. The field notes of an official survey made in 1821 show that the northern point of the eastern boundary of Choctaw territory was on "the south bank of the Arkansas River . . . distance from the Cherokee corner on the north bank of the river, one mile and thirty chains, Arkansas River 630 yards wide," and that the surveyor on "October 4th started from a post on the south side of the Arkansas, opposite the lower boundary of the Cherokees to meander the Arkansas." A plat of another survey of Choctaw lands made in 1825 shows the northern terminus of the eastern Choctaw boundary as being on the south side of the river.

There is little, if anything, in these early surveys to support ownership of the river bed in the Indians. On

the contrary, the indications clearly are that downstream from the Canadian River the southern border of the Cherokees' land was on the north side of the Arkansas River and the northern boundary of the Choctaws' land was on the south side.

I find unimpressive the Court's reliance on *Brewer-Elliott Oil & Gas Co.* v. *United States, supra,* for the proposition that because the southern boundary of the Cherokee lands ran "down the main channel of Arkansas river" the northern half of the river bed belonged to the Indians. In *Brewer-Elliott* the Cherokees had ceded certain land to the United States and from that land the United States created a home for the Osage Indians, "[b]ounded . . . on the south and west by . . . the main channel of the Arkansas river . . . ." 17 Stat. 229. As stated by the Court of Appeals, the central issue was whether the Osage Indians owned "the bed of the Arkansas river north of the thread of the main channel thereof, which was the south boundary of the lands of the Osage Tribe of Indians." 270 F. 100, 101 (C. A. 8th Cir. 1920). The Court of Appeals ruled that the river at that point was not navigable and that "riparian grantees and owners under the acts of Congress and under the law applicable in 1838, 1872, and 1883 at the place where these leased premises lie became the owners of the beds of unnavigable streams to the respective threads thereof. Rev. Stat. § 2476 [43 U. S. C. § 931]; *Railroad Co.* v. *Schurmeier* [*sic*], 7 Wall. 272, 287 . . . ." 270 F., at 109. This Court affirmed, pointing out, as was obviously true, that the grant extended "as far as the main channel . . . ." 260 U. S., at 87. Nothing the Court said, however, is any basis for construing a grant to or as far as the main channel of a *navigable* river as an express grant of any lands under that channel.

Much is made of the declarations in the treaties with the Cherokee and Choctaw Nations that the Indian

lands would not be included within any State or Territory. It is argued that in view of these declarations the United States had no reason to reserve the river bed. But this is a narrow view of the historic policy of the United States. Navigable rivers in the public domain were a public resource and lands underlying them were not to be conveyed to private hands by the United States. Whether or not it was anticipated that the public domain would be included in a future State, congressional policy, declared early in our history, was that conveyances of public lands bordering on navigable rivers carried no title to the adjoining river bed.

I cannot, therefore, conclude that either the Cherokees or the Choctaws took any interest in the bed of the Arkansas River, at least from the junction of the Arkansas River and the Canadian River downstream to the Arkansas border.

## III

The river bed above the Canadian River is said to be owned by the Cherokees because the tribe was granted lands on both sides of the river pursuant to a single metes and bounds description the calls of which crossed the river without excluding the river bed. It is quite true that if one plots out the conveyance described by the patent the Arkansas River is included within the perimeters of the granted property. But there is no express reference to the river bed, the river was a navigable stream, and the policy of the United States was not to convey lands underlying such waters. No such conveyance should be recognized unless the intention to make such a conveyance was unmistakably stated. No one suggests that the Cherokees were granted full sovereignty over the Arkansas River, that the United States had conveyed away its power to control navigation and commerce on the Arkansas, or that the public had lost

its right to travel the navigable portion of the Arkansas by virtue of the conveyance to the Cherokee Nation. There being no indications that the Indians thought one way or the other about the underwater lands or that they had any use for them in those days, the evidence is insufficient to prove an intent on the part of the Government to convey the river bed. Cf. *United States* v. *Holt State Bank, supra.*

Even if it were otherwise, however, the conveyance to the Cherokees was to the Cherokees as a Nation; it created no rights, legal or equitable, in individuals. Cf. *Fleming* v. *McCurtain,* 215 U. S. 56 (1909). If the river bed passed to the tribe, it was to be held by the Nation as property common to all. Moreover, the Cherokee patent expressly provided "that the lands hereby granted shall revert to the United States, if the said Cherokee Nation becomes extinct, or abandons the same." The Choctaw patent and treaties contained a similar condition. Such provision limited the duration of title and qualified "the absoluteness of the earlier words, 'in fee simple.'" *Fleming* v. *McCurtain, supra,* at 61. The significance of the limitation is that pursuant to agreements reached with the Cherokee, Choctaw, and Chickasaw Nations, Congress early in this century provided for the allotment of tribal lands to individual members of the tribe, terminated the general powers of the tribal governments and continued tribal existence for limited purposes only under the supervision of the Interior Department. See Act of June 28, 1898, 30 Stat. 495; Act of July 1, 1902, 32 Stat. 716; Act of April 26, 1906, 34 Stat. 137. Tribal lands for the most part were conveyed to individual Indians or sold. Transfers of lands to individuals along the navigable portion of the Arkansas River neither expressly nor by implication carried with them the river bed. The former Indian territory is not now either occupied or owned solely by

Indians but is widely held by diverse peoples and interests in the State of Oklahoma. Should it now be held that the title to the river bed, severed from and no longer serving communal property, remains in the tribe, to be administered or sold by it for purely private purposes? I think not. For the purposes anticipated by the treaties and patents, the Cherokee, Choctaw, and Chickasaw Nations ceased to exist as general governmental entities in 1906. Oklahoma became a State in 1907 and took title to the river bed, which had meanwhile reverted to the United States if title to the river bed had ever been in the Indian Nations.

I would affirm the judgment of the Court of Appeals.