The **CHOCTAW NATION** and the
Chickasaw Nation, Plaintiffs,

v.

The **CHEROKEE NATION**,
Defendant.

Civ. No. 73–332.

United States District Court,
E. D. Oklahoma.

April 15, 1975.

Lon Kile, Hugo, Okl., for plaintiffs.

Earl Boyd Pierce, Fort Gibson, Okl., and Andrew Wilcoxen, Muskogee, Okl., for defendant.

Before HOLLOWAY, Circuit Judge, and BOHANON and DAUGHERTY, District Judges.

## MEMORANDUM OPINION

BOHANON, District Judge.

In this case the plaintiff, Choctaw Nation, alleges that it owns an undivided ¾ interest and the plaintiff, Chickasaw Nation, an undivided ¼ interest in the natural bed of the Arkansas River from the confluence of the Arkansas River with the Canadian River thence to the Oklahoma-Arkansas boundary line, and both plaintiffs contend that their title encompassing the entire river bed should be quieted.

The defendant, Cherokee Nation, claims some right, title and interest in and to said real property above described and denies that the plaintiffs are the owners of the north half of the Arkansas River bed from the confluence of the Canadian River and the Arkansas River to the Oklahoma-Arkansas boundary line. Defendant further claims that it is the owner in fee simple of all that portion of the bed of the Arkansas River lying north of the center of the main channel below the mouth of the Canadian River to the Oklahoma-Arkansas boundary line. Defendant prays that full legal and equitable title to the above described north half of the Arkansas River be quieted against the plaintiffs, together with all accretion, bonuses, rents and royalties attributable thereto.

Jurisdiction in this Court was created by Congress December 20, 1973, under Public Law 93–195, 93rd Congress, H.R. 5089[1] wherein it gave the consent of the

---

1. "Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That: This Act may be cited as the 'Choctaw-Chickasaw-Cherokee Boundary Dispute Act'.

SEC. 2. The consent of the United States is hereby given to the Choctaw Nation, the Chickasaw Nation, and the Cherokee Nation to bring suit against each other to quiet the title in and to the bed of the Arkansas River below the Canadian Fork and to the eastern boundary of Oklahoma.

SEC. 3. Any action commenced pursuant to section 2 of this Act shall be heard and

United States to the Choctaw Nation, the Chickasaw Nation and the Cherokee Nation to bring suit against each other to quiet title in and to the bed of the Arkansas River below the Canadian Fork and to the eastern boundary of Oklahoma; further, that any action commenced pursuant to said authority would be heard and determined by a federal court of three judges selected in the manner provided by law and sitting in the United States District Court for the Eastern District of Oklahoma in accordance with the provisions of Section 4 of the Act, and that any party could appeal to the Supreme Court of the United States from final determination of such three-judge district court.

On January 28, 1974, Chief Judge David T. Lewis, United States Court of Appeals for the Tenth Circuit, created the following three-judge panel: Honorable David T. Lewis, United States Circuit Judge, Honorable Fred Daugherty, United States District Judge and Honorable Luther Bohanon, United States District Judge. Thereafter, Judge Lewis found it necessary to withdraw from the panel, and the Honorable William J. Holloway, Jr., United States Circuit Judge, was appointed as the Circuit Court member of the panel.

The issues to be determined by the Court were set forth in a Stipulation of the parties dated February 7, 1974, as follows:

"The plaintiffs and defendant, at pretrial conference on this 7th day of February, 1974, stipulate that their respective claims are questions of law to be decided by the Court upon consideration of the relevant Treaties, Statutes, Patents, Decisions and Historical Documents to be included in the briefs of the parties, directly or by reference, which are to be submitted on or before the 8th day of March, 1974, with each party thereafter to file briefs in answer to these principal briefs within fifteen (15) days.

It is further stipulated that the present Bureau of Indian Affairs study and determination of the location of the line dividing the Northerly and Southerly portions of the Arkansas River from the Eastern boundary of Oklahoma to the confluence of the Canadian River will be accepted by the parties as a determination of that line."

The sole question for this Court to decide from the stated evidence is whether the Cherokee Nation owns the north half

determined by a Federal court of three judges selected in the manner provided by law, sitting in the United States District Court for the Eastern District of Oklahoma, in accordance with the provisions of section 4 of this Act. Any party may appeal directly to the Supreme Court of the United States from the final determination by such three-judge district court.

SEC. 4. It is hereby declared to be the intent and the objective of the Congress that the relative rights and interests of said tribes making claims against each other in and to the surface and the subsurface of the lands identified in section 2 of this Act shall be judicially determined in accordance with principles of law and equity, including a consistent award or awards or release or releases to the Choctaw Nation, the Chickasaw Nation, and the Cherokee Nation of such bonus sums, rentals, and royalties, or other moneys paid or received on account of leasing of any portion of such lands. In furtherance of the accomplishment of this intent and the attainment of this objective, the parties are hereby authorized to enter into a settlement agreement in which provision may be made for a recognition in perpetuity of their relative rights to use and to enjoy the surface and the subsurface of the lands identified in section 2 of this Act, including the division of any and all of such bonus sums, rentals, and royalties, or other moneys paid or received on account of the leasing of any portion of said lands for any purpose or purposes. Such settlement agreement may be embodied in and be made a part of any decree of the court, which thereupon shall be final and conclusive with respect to the rights and interests of the parties.

SEC. 5. Nothing in this Act shall be deemed to be a congressional determination of the merits of the conflicting tribal claims with respect to the lands that are the subject of this Act.

Approved December 20, 1973."

of the Arkansas River bed, or whether the entire river bed belongs to the Choctaw and Chickasaw Nations. The pleadings reveal that there is no dispute that the Choctaw Nation and the Chickasaw Nation own the south half of the Arkansas River from the confluence of the Arkansas River with the Canadian River thence to the Oklahoma-Arkansas boundary line.

This case came on for trial to the Court on the 3rd day of January, 1975, and on that day evidence was received, the case being argued and submitted to the Court on the pleadings, exhibits, briefs and oral argument.

In the case of Choctaw Nation v. Oklahoma, 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970), the Supreme Court considered the identical treaties and cessions which are involved in this case. At page 629, at page 1334 of 90 S.Ct. the Court said:

> "The Choctaw treaties preceded any grant to the Cherokee Nation; and, under them, petitioners Choctaw and Chickasaw Nations claim the entire bed of the Arkansas River between its confluence with the Canadian River and the Oklahoma-Arkansas border. The Cherokees, however, also have a claim to this part of the river, based on the language setting out the southern border of the land granted them in the Treaty of New Echota: From a point on the Canadian River,
>
>> 'thence down the Canadian to the Arkansas; thence down the Arkansas to that point on the Arkansas where the eastern Choctaw boundary strikes said river . . . .' 7 Stat. 480."

The Court further stated at 630, at 1334 of 90 S.Ct.:

> "According to the Cherokee Nation, the United States thereby conveyed to it the north half of the Arkansas River from its junction with the Canadian to the eastern Oklahoma border. Petitioners thus are in disagreement about the effect of the words in the treaties and patents with regard to this lower portion of the river.[7]

7. The courts below did not resolve the dispute between petitioners, and we likewise do not pass on that question."

The Court concluded at 634, at 1336 of 90 S.Ct.:

> "Together, petitioners were granted fee simple title to a vast tract of land through which the Arkansas River winds its course. The natural inference from those grants is that all the land within their metes and bounds was conveyed, including the banks and bed of rivers."

The Supreme Court further stated at 635, at 1337 of 90 S.Ct.:

> "Finally, it must be remembered that the United States accompanied its grants to petitioners with the promise that 'no part of the land granted to them shall ever be embraced in any Territory or State.'
>
> . . .
>
> We thus conclude that the United States intended to and did convey title to the bed of the Arkansas River below its junction with the Grand River within the present State of Oklahoma in the grants it made to petitioners."

This Court must rely upon the same treaties which were considered by the Supreme Court in Choctaw Nation v. Oklahoma, *supra,* wherein it was determined that the river bed belonged to these Indian Nations and not to the State of Oklahoma.

First, we have the task of reconstructing the intent of the parties in the Cherokee Treaty of 1817 and the Choctaw Treaty of 1820 as to whether the United States conveyed, expressly or by inference, to the Choctaw or Cherokee Nations the Arkansas River bed from Point Remove in Arkansas Territory to the Canadian fork. In each of these treaties the Indians were ceding aboriginal title in and to portions of their lands east of the Mississippi River and were receiving what appears to be equivalent aboriginal title west of the Mississippi River.

Plaintiffs' counsel in his argument to the Court stated that plaintiffs' cause must rise or fall on the interpretation of the Treaty of 1820, and we agree.

Thereafter, we will reconstruct the meaning of the Choctaw Treaties of 1825, 1830 and 1855 and the Cherokee Treaties of 1828, 1833 and 1835 and will consider the meaning and effect of conveyance of fee simple title by patent.

## TREATY WITH THE CHEROKEE, 1817

7 Stat. 156
Proclamation,
Dec. 26, 1817

### Art. 5

(The United States to give as much land, etc., as they receive from the Cherokees.)

"The United States bind themselves, in exchange for the lands ceded in the first and second articles hereof, to give to that part of the Cherokee nation on the Arkansas as much land on said river and White river as they have or may hereafter receive from the Cherokee nation east of the Mississippi, acre for acre, as the just proportion due that part of the nation on the Arkansas agreeably to their numbers; which is to commence on the north side of the Arkansas river, at the mouth of Point Remove or Budwell's Old Place; thence, by a straight line, northwardly, to strike Chataunga mountain, or the hill first above Shield's Ferry on White river, running up and between said rivers for complement, the banks of which rivers to be the lines; and to have the above line, from the point of beginning to the point on White river, run and marked, which shall be done soon after the ratification of this treaty."

### Art. 9

(Free navigation of all the waters, etc.)

"It is also provided by the contracting parties, that nothing in the foregoing articles shall be construed so as to prevent any of the parties so contracting

## SECTION I

In order to clearly analyze and construe the meaning of the Cherokee Treaty of 1817 and the Choctaw Treaty of 1820, it is necessary to examine the specific language of relevant portions of the treaties, set out hereafter, which constitutes the touchstone of the claims of ownership in the Arkansas River bed.

## TREATY WITH THE CHOCTAW, 1820

7 Stat. 210
Proclamation,
Jan. 8, 1821                    (Doak's Stand)

### Art. 2

(United States cede a tract of country west of the Mississippi.)

"For and in consideration of the foregoing cession, on the part of the Choctaw nation, and in part satisfaction for the same, the Commissioners of the United States, in behalf of said States, do hereby cede to said nation, a tract of country west of the Mississippi River, situate between the Arkansas and Red River, and bounded as follows:—Beginning on the Arkansas River, where the lower boundary line of the Cherokees strikes the same; thence up the Arkansas to the Canadian Fork, and up the same to its source; thence due South to the Red River; thence down Red River, three miles below the mouth of Little River, which empties itself into Red River on the north side; thence a direct line to the beginning."

### Art. 3

(Commissioners to ascertain the boundaries.)

"To prevent any dispute upon the subject of the boundaries mentioned in the 1st and 2d articles, it is hereby stipulated between the parties, that the same shall be ascertained and distinctly marked by a Commissioner, or Commissioners, to be appointed by the United States, accompanied by such person as the Choctaw nation may select; said na-

from the free navigation of all the waters mentioned therein."

Art. 11

(Boundary lines to be run by commissioners.)

"It is further agreed that the boundary lines of the lands ceded to the United States by the first and second articles of this treaty, and the boundary line of the lands ceded by the United States in the fifth article of this treaty, is to be run and marked by a commissioner or commissioners appointed by the President of the United States, who shall be accompanied by such commissioners as the Cherokees may appoint; due notice thereof to be given to the nation."

tion having thirty days previous notice of the time and place at which the operation will commence. The person so chosen by the Choctaws, shall act as a pilot or guide, for which the United States will pay him two dollars per day, whilst actually engaged in the performance of that duty."

---

By the Cherokee Treaty of 1817, the United States conveyed to the Cherokee Nation a tract of land in Arkansas Territory between the Arkansas River and the White River, west of a line commencing at the mouth of Point Remove or Budwell's Old Place and running north to Shield's Ferry on the White River. The boundaries of this tract of land were described as being from the banks of the two rivers. The cession, however, granted to the Cherokee Nation free navigational rights to the rivers, thus clouding any later disposition thereof by the United States.

The United States by Article 2 of the Treaty of 1820 granted to the Choctaw Nation country described as being "situate between" the Arkansas River and the Red River and is bounded as follows:

"Beginning *on* the Arkansas River, where the lower boundary line of the Cherokees strikes the same; [at the mouth of Point Remove or Budwell's Old Place] thence *up* the Arkansas to the Canadian Fork, and up the same to its source . . . thence down Red River, three miles below the mouth of Little River, which empties itself into Red River on the north

side; thence a direct line to the beginning." (Emphasis added)

The words "situate between" mean a certain location or position, and the Treaty of 1820 specifically provides that the Choctaw country was situated between the Arkansas River and the Red River.

The authors of the treaty further use the words: "*on* the Arkansas River, where the lower boundary line of the Cherokees strikes the same; thence *up* the Arkansas to the Canadian Fork . . . thence down Red River . . . thence a direct line to the beginning." We find that the authors of the treaty were saying that the beginning point was at Point Remove in Arkansas Territory, which was a reference point for the beginning of the boundary line, which boundary line actually began "*on* the Arkansas River." This is so because the final part of the description using the words, "thence a direct line to the beginning," brings the description back to Point Remove. The true interpretation is that the words, "*on* the river" and "*up* the river" mean exactly what they say, and there is no way to interpret these words to mean on the north bank of the river, as the Choctaw Nation has claimed in this case.

We believe that had the United States intended to grant the Arkansas River bed to the Choctaw Nation it would have said so. It would have been a simple matter for the United States to have said: beginning at the mouth of Point Remove where the Cherokee boundary line strikes the same thence up the north bank of the Arkansas River to the confluence of the Canadian River. This, of course, the United States did not say, but rather said: *on* and *up* the Arkansas to the Canadian fork.

The United States, by its language, showed no clear intent to grant the river bed to the Choctaw Nation, nor has there ever been any indication that the Choctaw Nation believed it had received the river bed in said cession. The surrounding circumstances, on the other hand, indicate that the United States was reserving the Arkansas River, which at that time was recognized as a navigable river, for commercial purposes as shown by the grant to the Cherokee Nation of free navigational use. It will be noted that the later Choctaw Treaty of 1830 granted the Choctaws free navigational rights on the Arkansas River and specified that they were to pay no higher toll than United States citizens paid for the use thereof.

The Arkansas River bed has been the boundary line between the Choctaw and Chickasaw Nations and the Cherokee Nation since 1820, and neither party had claimed the river bed until the Cherokee Nation filed its suit against the State of Oklahoma and several oil companies on December 9, 1966, (Case No. 6219) more than 145 years after the 1820 Treaty between the United States and the Choctaw Nation.

From a careful reading of the two treaties and all of the relevant correspondence and court authorities, it seems to us that great weight must be given to the words in Article 9 of the Cherokee Treaty of 1817: "It is also provided by the contracting parties, that nothing in the foregoing articles shall be construed so as to prevent any of the parties so contracting from the free navigation of all the waters mentioned therein." These words convince us that at the time of both the 1817 Treaty and the 1820 Treaty the United States was reserving the Arkansas River for navigational purposes.

We find that the words in the Choctaw Treaty of 1820: "Beginning on the Arkansas River, where the lower boundary line of the Cherokees strikes the same; thence up the Arkansas to the Canadian Fork," mean nothing and prove nothing in the way of granting the river bed; that the point established by the words: "where the lower boundary line of the Cherokees strikes the same" is simply a monument or marker for a point of beginning and thus "up the Arkansas to the Canadian Fork" simply means that the river is the boundary line for the large tract of land. Neither party understood it to include the river bed.

Judge Breitenstein in Cherokee Nation or Tribe of Indians v. State of Oklahoma, 402 F.2d 739 (C.A.10, 1968) points out:

"The Indians seek comfort from the technical language of the treaties and grants. They attach significance to such phrases as 'to the Arkansas River,' 'down the Arkansas,' and 'thence down the main channel of the Arkansas.' We agree with Oklahoma that references to the Arkansas River are for the purpose of establishing reference points, monuments, or boundaries. They do not indicate an intent, much less a clear intent, to convey the riverbed."

The United States Supreme Court reversed the decision of the Circuit Court in that case on the basis that the Choctaw Treaties of 1825, 1830 and 1855 and the Cherokee Treaties of 1828, 1833 and 1835 granted fee simple title by patent to large tracts of land described in the treaties, and the United States made no reservation of the Arkansas River.

■ We believe that by use of the words in Article 2 of the Choctaw Treaty of 1820: "do hereby cede to said nation, a tract of country west of the Mississippi River, situate *between* the Arkansas and Red River," (emphasis added), Congress meant exactly what the words purport to convey, and Congress thereby indicated no intention to convey the bed of the Arkansas River.

## SECTION II

Shortly after the Cherokee Nation moved onto their lands in Arkansas Territory west of the Mississippi River in 1817 and the Choctaw Nation moved onto their lands in Arkansas Territory west of the Mississippi River in 1820, they became dissatisfied because of the white settlers in the area. The remaining tribal members east of the Mississippi River were knowledgeable of this fact and also became dissatisfied and frustrated and were accordingly convinced of the lack of good faith of the United States government in giving them a territory free of white man's intrusion. Thus, both the Choctaws and the Cherokees became more reluctant to move west of the Mississippi River. The official pressure of the States of Mississippi, Georgia and Alabama continued to worsen and demanded that the United States move the Indians west of the Mississippi River, and in order for the United States to exculpate itself from the problems of the Indians and of the southern states, it fell upon a new policy of affording better treatment to the Indians, with greater money inducements and guarantees of a permanent home for the Indians free of white man's intrusion, and above all granting them the land by fee simple title and presidential patent.

The new policy provided that the government would in good faith grant large tracts of land by fee simple title and by patent signed by the President of the United States, and as a further inducement the Indians were granted the following: cash annuities, money for moving expenses, an agent in the new territory, teachers for their children, farming leaders, a blacksmith and adjustment of all their differences. These inducements prompted the Indians to begin in earnest to enter into lasting treaties with the United States, ceding their tribal lands east of the Mississippi River for fee simple title to lands west of the Mississippi River. As a result of these inducements, especially fee simple title, the United States brought about the Treaties of 1825, 1830 and 1855 with the Choctaws and the Treaties of 1828, 1833 and 1835 with the Cherokees. Pertinent parts of these later treaties as they relate to the question before this Court are set out on the following pages.

## TREATY WITH THE WESTERN CHEROKEE 1828

7 Stat. 311
Proclamation,
May 28, 1828

"Whereas, it being the anxious desire of the Government of the United States to secure to the Cherokee nation of Indians, as well as those now living within the limits of the Territory of Arkansas, as those of their friends and brothers who reside in States East of the Mississippi, and who may wish to join their brothers of the West, a permanent home, and which shall, under the most

## TREATY WITH THE CHOCTAW, 1825

7 Stat. 234
Proclamation,
Feb. 19, 1825

"Whereas a Treaty of friendship, and limits, and accommodation, having been entered into at Doake's Stand, on the eighteenth of October, in the year one thousand eight hundred and twenty, between Andrew Jackson and Thomas Hinds, Commissioners on the part of the United States, and the Chiefs and Warriors of the Choctaw Nation of Indians; and whereas the second article of

solemn guarantee of the United States, be, and remain, theirs forever—a home that shall never, in all future time, be embarrassed by having extended around it the lines, or placed over it the jurisdiction of a Territory or State, nor be pressed upon by the extension, in any way, of any of the limits of any existing Territory or State; and, Whereas, the present location of the Cherokees in Arkansas being unfavorable to their present repose, and tending, as the past demonstrates, to their future degradation and misery; and the Cherokees being anxious to avoid such consequences, and yet not questioning their right to their lands in Arkansas, as secured to them by Treaty, and resting also upon the pledges given them by the President of the United States, and the Secretary of War, of March, 1818, and 8th October, 1821 in regard to the outlet to the West, and as may be seen on referring to the records of the War Department, still being anxious to secure a permanent home, and to free themselves, and their posterity, from an embarrassing connexion with the Territory of Arkansas, and guard themselves from such connexions in future; and, Whereas it being important, not to the Cherokees only, but also to the Choctaws, and in regard also to the question which may be agitated in the future respecting the location of the latter, as well as the former, within the limits of the Territory or State of Arkansas, as the case may be, and their removal therefrom; and to avoid the cost which may attend negotiations to rid the Territory or State of Arkansas whenever it may become a State, of either, or both of those Tribes, the parties hereto do hereby conclude the following Articles, viz:"

### Art. 1

(Western boundary of Arkansas defined.)

"The Western boundary of Arkansas shall be, and the same is, hereby defined, viz: A line shall be run, commencing on Red River, at the point where the Treaty aforesaid provides for a cession of lands, west of the Mississippi, to the Choctaw Nation, in part satisfaction for lands ceded by said Nation to the United States, according to the first article of said treaty: And whereas, it being ascertained that the cession aforesaid embraces a large number of settlers, citizens of the United States; and it being the desire of the President of the United States to obviate all difficulties resulting therefrom, and also, to adjust other matters in which both the United States and the Choctaw Nation are interested: the following articles have been agreed upon, and concluded, between John C. Calhoun, Secretary of War, specially authorized therefor by the President of the United States, on the one part, and the undersigned Delegates of the Choctaw Nation, on the other part:"

### Art. 1

(Lands ceded to the United States.) "The Choctaw Nation do hereby cede to the United States all that portion of the land ceded to them by the second article of the Treaty of Doak Stand, as aforesaid, lying east of a line beginning on the Arkansas, one hundred paces east of Fort Smith, and running thence, due south, to Red river: it being understood that this line shall constitute, and remain, the permanent boundary between the United States and the Choctaws; and the United States agreeing to remove such citizens as may be settled on the west side, to the east side of said line, and prevent future settlements from being made on the west thereof."

### Art. 2

($6,000 to be paid to Choctaws annually forever.)

"In consideration of the cession aforesaid, the United States do hereby agree to pay the said Choctaw Nation the sum of six thousand dollars, annually, forever; it being agreed that the said sum of six thousand dollars shall be annual-

the Eastern Choctaw line strikes said River, and run due North with said line to the River Arkansas, thence in a direct line to the South West corner of Missouri."

Art. 2

(Territory guaranteed to Cherokees by the United States.)

"* * * seven millions of acres of land, to be bounded as follows, viz: Commencing at that point on Arkansas River where the Eastern Choctaw boundary line strikes said River, and running thence with the Western line of Arkansas, as defined in the foregoing article, to the South-West corner of Missouri, and thence with the Western boundary line of Missouri till it crosses the waters of Neasho, generally called Grand River, thence due West to a point from which a due South course will strike the present North West corner of Arkansas Territory, thence continuing due South, on and with the present Western boundary line of the Territory to the main branch of Arkansas River, thence down said River to its junction with the Canadian River, and thence up and between the said Rivers Arkansas and Canadian, to a point at which a line running North and South from River to River, will give the aforesaid seven millions of acres. In addition to the seven millions of acres thus provided for, and bounded, the United States further guarantee to the Cherokee Nation a perpetual outlet, West, and a free and unmolested use of all the Country lying West of the Western boundary of the above described limits, and as far West as the sovereignty of the United States, and their right of soil extend."

Art. 3

(United States to run the lines.)

"The United States agree to have the lines of the above cession run without delay, say not later than the first of October next, and to remove, immediately after the running of the Eastern line from the Arkansas River to the South-West corner of Missouri, all white

ly applied, for the term of twenty years, under the direction of the President of the United States, to the support of schools in said nation, and extending to it the benefits of instruction in the mechanic and ordinary arts of life; when, at the expiration of twenty years, it is agreed that the said annuity may be vested in stocks, or otherwise disposed of, or continued, at the option of the Choctaw nation."

Art. 3

($6,000 to be paid them annually for 16 years.)

"The eighth article of the treaty aforesaid having provided that an appropriation of lands shall be made for the purpose of raising six thousand dollars a year for sixteen years, for the use of the Choctaw Nation; and it being desirable to avoid the delay and expense attending the survey and sale of said land; the United States do hereby agree to pay the Choctaw Nation, in lieu thereof, the sum of six thousand dollars, annually, for sixteen years, to commence with the present year. And the United States further stipulate and agree to take immediate measures to survey and bring into market, and sell, the fifty-four sections of land set apart by the seventh article of the treaty aforesaid, and apply the proceeds in the manner provided by the said article."

Art. 4

(Provision for Choctaws who may deside to remain.)

"It is provided by the ninth section of the treaty aforesaid, that all those of the Choctaw Nation who have separate settlements, and fall within the limits of the land ceded by said Nation to the United States, and desire to remain where they now reside, shall be secured in a tract or parcel of land, one mile square, to include their improvements."

Art. 5

(A certain debt due by Choctaws relinquished.)

persons from the West to the East of said line, and also all others, should there be any there, who may be unacceptable to the Cherokees, so that no obstacles arising out of the presence of a white population, or a population of any other sort, shall exist to annoy the Cherokees—and also to keep all such from the West of said line in future.

## Art. 7

(Cherokees to surrender lands in Arkansas within 14 months)

"The Chiefs and Head Men of the Cherokee Nation, aforesaid, for and in consideration of the foregoing stipulations and provisions, do hereby agree, in the name and behalf of their Nation, to give up, and they do hereby surrender, to the United States, and agree to leave the same within fourteen months, as herein before stipulated, all the lands to which they are entitled in Arkansas, and which were secured to them by the Treaty of 8th January, 1817, and the Convention of the 27th February, 1819."

## Art. 6

(Payment for services rendered in the Pensacola campaign.)

## Art. 8

(Payment to satisfy claims due by United States.)

## Art. 9

(An agent and blacksmith for Choctaws west of the Mississippi.)

"It is further agreed that, immediately upon the Ratification of this Treaty, or as soon thereafter as may be, an agent shall be appointed for the Choctaws West of the Mississippi, and a Blacksmith be settled among them, in conformity with the stipulation contained in the 6th Article of the Treaty of 1820."

## TREATY WITH THE WESTERN CHEROKEE 1833

7 Stat. 414
Proclamation,
Apr. 12, 1834.

## Art. 1

(Land granted to the Cherokees)

"The United States agree to possess the Cherokees, and to guarantee it to them forever, and that guarantee, is hereby pledged, of seven millions of acres of land, to be bounded as follows viz: Beginning at a point on the old western territorial line of Arkansas Territory, being twenty-five miles north from the point, where the Territorial line crosses Arkansas river—thence running from said north point, south, on the said Territorial line, to the place where said Territorial line crosses the Verdigris river—thence down said Verdigris river, to the Arkansas river—thence down said Arkansas to a point, where a stone is placed opposite to the east or lower bank of Grand river at its junction with

## TREATY WITH THE CHOCTAW 1830

7 Stat. 333
Proclamation,
Feb. 24, 1831.
(Dancing Rabbit
Creek)

## Art. 1

(Peace and friendship)

"Perpetual peace and friendship is pledged and agreed upon by and between the United States and the Mingoes, Chiefs, and Warriors of the Choctaw Nation of Red People; and that this may be considered the Treaty existing between the parties all other Treaties heretofore existing and inconsistent with the provisions of this are hereby declared null and void."

## Art. 2

(Country to be conveyed to Choctaws)

"The United States under a grant specially to be made by the President of the U. S. shall cause to be conveyed to

the Arkansas—thence running south, forty-four degrees west, one mile—thence in a straight line to a point four miles northerly from the mouth of the north fork of the Canadian—thence along the said four miles line to the Canadian—thence down the Canadian to the Arkansas—thence, down the Arkansas, to that point on the Arkansas, where the eastern Choctaw boundary strikes, said river; and running thence with the western line of Arkansas Territory as now defined, to the southwest corner of Missouri—thence along the western Missouri line, to the land assigned the Senecas; thence, on the south line of the Senecas to Grand river; thence, up said Grand river, as far as the south line of the Osage reservation, extended if necessary—thence up and between said south Osage line, extended west if necessary and a line drawn due west, from the point of beginning, to a certain distance west, at which, a line running north and south, from said Osage line, to said due west line, will make seven millions of acres within the whole described boundaries. In addition to the seven millions of acres of land, thus provided for, and bounded, the United States, further guarantee to the Cherokee nation, a perpetual outlet west and a free and unmolested use of all the country lying west, of the western boundary of said seven millions of acres, as far west as the sovereignty of the United States and their right of soil extend—Provided however that if the saline, or salt plain, on the great western prairie, shall fall within said limits prescribed for said outlet, the right is reserved to the United States to permit other tribes of red men, to get salt on said plain in common with the Cherokees—and letters patent shall be issued by the United States as soon as practicable for the land hereby guaranteed."

the Choctaw Nation a tract of country west of the Mississippi River, in fee simple to them and their descendants, to inure to them while they shall exist as a nation and live on it, beginning near Fort Smith where the Arkansas boundary crosses the Arkansas River, running thence to the source of the Canadian fork; if in the limits of the United States, or to those limits; thence due south to Red River, and down Red River to the west boundary of the Territory of Arkansas; thence north along that line to the beginning. The boundary of the same to be agreeably to the Treaty made and concluded at Washington City in the year 1825. The grant to be executed so soon as the present Treaty shall be ratified."

Art. 11

(Navigable streams, post-offices and military posts)

"Navigable streams shall be free to the Choctaws who shall pay no higher toll or duty than citizens of the U. S. It is agreed further that the U. S. shall establish one or more Post Offices in said Nation, and may establish such military post roads, and posts, as they may consider necessary."

Art. 16

(Removal of Indians—cattle)

"In wagons; and with steam boats as may be found necessary—the U. S. agree to remove the Indians to their new homes at their expense and under the care of discreet and careful persons, who will be kind and brotherly to them. They agree to furnish them with ample corn and beef, or pork for themselves and families for twelve months after reaching their new homes.

It is agreed further that the U. S. will take all their cattle, at the valuation of some discreet person to be appointed by

## TREATY WITH THE CHEROKEE
### 1835

7 Stat. 478
Proclamation
May 23, 1836
            (New Echota)
            (Georgia)

Art. 2
(The land described herein was conveyed and guaranteed to the Cherokees West of the Mississippi River in the Treaties of May, 1828 and February, 1833. Said land was described in those Treaties and will not be here repeated.)

Art. 3
(Further agreement)
"The United States also agree that the lands above ceded by the treaty of Feb. 14, 1833, including the outlet, and those ceded by this treaty shall all be included in one patent executed to the Cherokee nation of Indians by the President of the United States according to the provisions of the act of May 28 1830."

Art. 17
"All stipulations in former treaties which have not been superseded or annulled by this shall continue in full force and virtue."

the President, and the same shall be paid for in money after their arrival at their new homes; or other cattle such as may be desired shall be furnished them, notice being given through their Agent of their wishes upon this subject before their removal that time to supply the demand may be afforded."

Art. 17
(Continuation of annuities under former treaties and further annuities)

Art. 18
(Survey of ceded lands, etc.)
"The U. S. shall cause the lands hereby ceded to be surveyed; and surveyors may enter the Choctaw Country for that purpose, conducting themselves properly and disturbing or interrupting none of the Choctaw people. * * * And further it is agreed, that in the construction of this Treaty wherever well founded doubt shall arise, it shall be construed most favorably towards the Choctaws."

---

## TREATY WITH THE CHOCTAW
### AND CHICKASAW 1855

11 Stat. 611
Proclamation
Mar. 4, 1856

Whereas, the political connection heretofore existing between the Choctaw and the Chickasaw tribes of Indians, has given rise to unhappy and injurious dissensions and controversies among them, which render necessary a readjustment of their relations to each other and to the United States: and

*     *     *     *     *     *

whereas, the Choctaws contend, that, by a just and fair construction of the

treaty of September 27, 1830, they are, of right, entitled to the net proceeds of the lands ceded by them to the United States, under said treaty, and have proposed that the question of their right to the same, together with the whole subject-matter of their unsettled claims, whether national or individual, against the United States, arising under the various provisions of said treaty, shall be referred to the Senate of the United States for final adjudication and adjustment, and whereas, it is necessary for the simplification and better understanding of the relations between the United States and the Choctaw Indians, that all their subsisting treaty stipulations

238

be embodied in one comprehensive instrument:"

Art. 1

(Future boundaries of the Choctaw and Chickasaw country)

"The following shall constitute and remain the boundaries of the Choctaw and Chickasaw country, viz: Beginning at a point on the Arkansas River, one hundred paces east of old Fort Smith, where the western boundary line of the State of Arkansas crosses the said river, and running thence due south to Red River; thence up Red River to the point where the meridian of one hundred degrees west longitude crosses the same; thence north along said meridian to the main Canadian River; thence down said river to its junction with the Arkansas River; thence down said river to the place of beginning.

And pursuant to an act of Congress approved May 28, 1830, the United States do hereby forever secure and guarantee the lands embraced within the said limits, to the members of the Choctaw and Chickasaw tribes, their heirs and successors, to be held in common; so that each and every member of either tribe shall have an equal, undivided interest in whole: Provided, however, No part thereof shall ever be sold without the consent of both tribes, and that said land shall revert to the United States if said Indians and their heirs become extent or abandon the same."

Art. 21

(This treaty to supersede all former treaties)

"This convention shall supersede and take the place of all former treaties between the United States and the Choctaws, and also, of all treaty stipulations between the United States and the Chickasaws, and between the Choctaws and Chickasaws, inconsistent with this agreement, and shall take effect and be obligatory upon the contracting parties, from the date hereof, whenever the same shall be ratified by the respective councils of the Choctaw and Chickasaw tribes, and by the President and Senate of the United States."

The purpose of the Choctaw Treaty of 1825 was to secure a permanent home for the Choctaw Indians by moving the Choctaws in southwestern Arkansas Territory and those east of the Mississippi River to the west of the western Arkansas Territorial line and between the Arkansas River and the Red River. Further they were assured that all difficulties would be resolved. This treaty further proposed to adjust all differences between the Choctaw Nation and the United States, to pay to the Choctaw Nation and its members a large amount of money and other annuities for a number of years and to provide the Choctaws with many other benefits.

The Choctaws, by Article 1 of the 1825 Treaty, ceded back to the United States "all of the land" it had acquired in the southwestern territory of Arkansas by the Treaty of 1820. The Arkansas River bed was not mentioned in the 1825 Treaty, and it is, therefore, possible to assume that if the Doak's Stand Treaty of 1820 granted the Arkansas River bed to the Choctaw Nation, the Choctaw Nation did not expressly cede it back to the United States in the Treaty of 1825. Were this true, the Choctaw Nation might still seek to claim the river bed from Point Remove to the western boundary of Arkansas, as well as the Arkansas River bed from the Canadian fork to the western boundary of Arkansas. No claim has ever been made to this section of the river, and if by a wild construction of the language in the 1820 Treaty the Choctaws did acquire the river bed, then they might still lay claim to it, provided they did not surrender it by the "null and void" provision of the 1830 Treaty and by the wording of the 1855 Treaty. We believe it is clear that the Choctaws did not own this portion of the river bed, and it is clear that they did not own the section from the Arkansas boundary to the Canadian fork.

The Cherokee Treaty of 1828 had the same general provisions as the Choctaw Treaty of 1825. The 1828 Treaty provided for the removal of the Cherokees out of northwestern Arkansas Territory to the west of the western boundary line of Arkansas and further provided for the removal of the Cherokees east of the Mississippi River to the same country. It granted to the Cherokees seven million acres of country west of Arkansas and north of the Arkansas River and further granted to the Cherokee Nation and its members cash annuities and other benefits. Article 1 of the Treaty described the western boundary of Arkansas; Article 2 described the seven million acres which were ceded to the Cherokees, and Article 7 provided for the Cherokees to surrender back to the United States their land in the Arkansas Territory which had been granted to them in the Treaty of 1817.

Article 1 of the Choctaw Treaty of 1830 provided that all other treaties theretofore existing and inconsistent with this treaty would be held null and void. Article 2 provided that:

"The United States under a grant specially to be made by the President of the U. S. shall cause to be conveyed to the Choctaw Nation a tract of country west of the Mississippi River, in fee simple, . . . beginning near Fort Smith where the Arkansas boundary crosses the Arkansas River, running thence to the source of the Canadian fork . . . thence due south to Red River, and down Red River to the west boundary of the Territory of Arkansas; thence north along that line to the beginning. The boundary of the same to be agreeably to the Treaty made and concluded at Washington City in the year 1825. The grant to be executed so soon as the present Treaty shall be ratified."

It appears to us that if the language of Article 2 of the 1830 Treaty is inconsistent with that of the Treaty of 1820, then the 1820 Treaty is to be held null and void. As the boundary in the 1830 Treaty began near Fort Smith, which is on the south side of the Arkansas River, and the boundary in the 1820 Treaty began at Point Remove, which is on the north side of the Arkansas River, there is consequently an inconsistency which renders the Treaty of 1820 null and void, and under this latter description there is no basis upon which the Choctaw Nation can in good conscience legally or equitably claim ownership of the Arkansas River bed. There are no words clearly conveying the river bed, nor are there any words of inference to convey the entire river bed to the Choctaw Nation in any of the treaties.

■ Article 11 of the 1830 Treaty provides that the "Navigable streams shall be free to the Choctaws who shall pay no higher toll or duty than citizens of the U. S." This to us is quite convincing that the Choctaw Nation acquired no title in and to the Arkansas River bed by reason of the Doak's Stand Treaty of 1820, but if they did acquire such rights, then clearly they were surrendered in the Treaty of 1830, and the Choctaws were granted free navigation rights. It would be useless and folly for Congress to give free navigational rights upon a river had the river bed been owned by the Choctaw Nation.

The 1830 Treaty refers to the payment of annuities, and in this connection reference is made to Choctaw Nation v. United States, 119 U.S. 1, 7 S.Ct. 75, 30 L.Ed. 306 (1886), wherein the Court found that the Choctaws were entitled to $2,731,247.30 in unpaid annuities and benefits which sum was in addition to all other benefits which had been paid. For a better understanding of the annuities and benefits, the above case is suggested reading.

■ In the Cherokee Treaties of 1833 and 1835 the United States guaranteed to the Cherokee Nation and to its members fee simple title to fourteen million acres of land west of the western boundary of Arkansas Territory and north of the Arkansas River. The entire description of the Cherokee country is too long to re-

state at this point; however, it is noted that the descriptions in the Treaties of 1833 and 1835 are exactly the same, and the relevant part thereof is as follows:

"[T]hence down the Canadian to the Arkansas—thence, down the Arkansas, to that point on the Arkansas, where the eastern Choctaw boundary strikes, said river; and running thence with the western line of Arkansas Territory as now defined, to the southwest corner of Missouri . . . .."

Therefore, it is clear and unambiguous that the Arkansas River became the southern boundary of the Cherokee Nation to the north of the Arkansas River and, likewise, the Arkansas River became the northern boundary of the Choctaw country as described in the Treaty of 1830.

The 1855 Treaty of the Choctaw and Chickasaw Nations provided, among other things, in Article 1:

"The following shall constitute and remain the boundaries of the Choctaw and Chickasaw country, viz: Beginning at a point on the Arkansas River, one hundred paces east of old Fort Smith, where the western boundary line of the State of Arkansas crosses said river, and running thence due south to Red River; thence up Red River to the point where the meridian of one hundred degrees west longitude crosses the same; thence north along said meredian to the main Canadian River; thence down said river to its junction with the Arkansas River; thence down said river to the place of beginning." (Fort Smith is located south of the Arkansas River.)

This clearly demonstrates to us that at no time did either the United States have any intent or the Choctaw and Chickasaw Nations or the Cherokee Nation have any belief that previous treaties conveyed any part of the Arkansas River bed to the Choctaw Nation, to the exclusion and damage of the Cherokee Nation. The 1855 Treaty further provided that it would supersede all former treaties between the United States and the Choctaws and between the United States and the Chickasaws. This being so, there can be no merit in the claim of the Choctaws and Chicasaws to any part of the river bed until, of course, it was determined in Choctaw v. Oklahoma, *supra*, that the river bed passed to the Indians by reason of the treaty provisions of fee simple title and the issuance of patents by the United States. There is no clear intent that the United States passed title of the Arkansas River bed to the Choctaw Nation, and the treaties and patents herein set out negate any assumption of such title passing to the Choctaw Nation.

## SECTION III

■ Hereafter are quoted the essential parts of the patents issued by President Van Buren to the Cherokees in 1838 and by President Tyler to the Choctaws in 1842 upon the authority of the treaties approved by the United States Senate, such approval making the documents the most sanctified our government can issue. Once land passed by patent, it evidenced fee simple title to the holders thereof and to the thousands of members of each tribe or nation of Indians to whom the land was later allotted.

Excerpts from Cherokee Patent of 1838

"AND WHEREAS, the United States have caused the said tract of Seven Millions of Acres, together with the said perpetual outlet, to be surveyed in one tract, the boundaries whereof are as follows: * * * thence down the Canadian River on its north bank to its

Patent issued to Choctaws in 1842

"WHEREAS, by the second Article of the Treaty began and held at Dancing Rabbit Creek, on the fifteenth day of September, in the year of our Lord one thousand eight hundred and thirty, (as ratified by the Senate of the United States, on the 24th February, 1831) by

junction with Arkansas river; thence down the main channel of Arkansas river to the western boundary of the State of Arkansas at the northern extremity of the eastern boundary of the lands of the Choctaws on the south bank of Arkansas river, four chains and fifty four links east of Fort Smith; thence north seven degrees twenty five minutes west with the western boundary of the State of Arkansas, seventy-six miles sixty four chains and fifty links, to the southwest corner of the State of Missouri; * * *

* * * * * *

THEREFORE, in execution of the agreements and stipulations contained in the said several treaties, the United States have GIVEN and GRANTED and by these presents do GIVE and GRANT, unto the said Cherokee nation, the two tracts of land so surveyed and herein before described, containing in the whole fourteen millions, three hundred and seventy four thousand, one hundred and thirty-five acres and fourteen-hundredths of an acre:.

TO HAVE AND TO HOLD THE SAME, together with the rights privileges and appurtenances thereunto belonging, to the said CHEROKEE NATION FOREVER, subject, however, to the right of the United States to permit other tribes of red men to get salt on the salt plain on the western prairie, referred to in the second article of the treaty of the twenty-ninth of December, one thousand eight hundred and thirty five, which salt plains has been ascertained to be within the limits prescribed for the outlet agreed to be granted by the said article; and subject also to all the other rights reserved to the United States in and by the articles hereinbefore recited, to the extent and in the manner in which the said rights are reserved and subject also to the condition provided by the Act of Congress of the twenty-eighth of May, one thousand eight hundred and thirty, referred to in the above recited third article, and which condition is that the lands hereby

the Commissioners on the part of the United States, and the Mingoes, Chiefs, Captains, and Warriors, of the Choctaw Nation, on the part of said Nation, it is provided that 'The United States under a grant specially to be made by the President of the U. S. shall cause to be conveyed to the Choctaw Nation a tract of Country West of the Mississippi river, in fee simple, to them and their descendants, to inure to them while they shall exist as a Nation and live on it:—Beginning near fort Smith where the Arkansas boundary crosses the Arkansas river, running thence to the source of the Canadian fork, if in the limits of the United States, or to those limits; thence due South to Red river, and down Red river to the West boundary of the territory of Arkansas; thence North along that line to the beginning.—The boundary of the same to be agreeably to the treaty made and concluded at Washington City in the year 1825.'

NOW KNOW YE, that the United States of America, in consideration of the premises, and in execution of the Agreement and stipulations in the aforesaid Treaty, Have Given and Granted, and by these Presents Do Give and Grant, unto the said Choctaw Nation, the aforesaid 'tract of Country West of the Mississippi;' To Have and to Hold the same with all rights, privileges, immunities, and appurtenances of whatsoever nature, thereunto belonging, as intended 'to be conveyed' by the aforesaid Article, 'in fee simple, to them and their descendants, to inure to them, while they shall exist as a nation and live on it,' liable to no transfer or alienation, except to the United States, or with their consent.

IN TESTIMONY WHEREOF, I John Tyler President of the United States of America, have caused these Letters to be made Patent, and the Seal of the General Land Office to be hereunto affixed."

granted shall revert to the United States if the said Cherokee Nation ceases and abandons the same.—

IN TESTIMONY WHEREOF, I Martin Van Buren, PRESIDENT OF THE UNITED STATES OF AMERICA, have caused these letters to be made PATENT and the SEAL of the GENERAL LAND OFFICE to be hereunto affixed.

GIVEN under my hand, at the City of Washington, the thirty-first day of December in the year of our Lord one thousand eight hundred and thirty eight, and of the Independence of the United States, the sixty third."

---

We conclude, from a careful study of the description of the Cherokee country in the Patent of 1838 and from a careful study of the description of the Choctaw country in the Patent of 1842, that the Arkansas River bed from the western boundary of Arkansas to the Canadian fork became a common boundary to the Choctaws and Chickasaws on the south and to the Cherokees on the north of the Arkansas River; that the thread of the main channel of said river was the boundary line.

We come now to consider the authorities on the question of whether the Choctaw Nation acquired by the general terms of the Treaty of 1820 any part of the Arkansas River bed from Point Remove in Arkansas to the Canadian fork on the Arkansas River. From a careful and diligent search of all the authorities on this question, we have been unable to find any authority relating to this question wherein one Indian tribal nation claims the bed of a river to the detriment and damage of another tribe. There are three tribes of Indians involved here: the Choctaw Nation and the Chickasaw Nation claiming the whole of the Arkansas River bed and the Cherokee Nation claiming only the north half of the Arkansas River bed.

The Supreme Court said in Worcester v. Georgia, 6 Pet. 515, 581, 8 L.Ed. 483 (1832):

"The language used in treaties with the Indians should never be construed to their prejudice. If words be made use of, which are susceptible of a more extended meaning than their plain import, as connected with the tenor of the treaty, they should be considered as used only in the latter sense. . . . How the words of the treaty were understood by this unlettered people, rather than their critical meaning, should form the rule of construction."

This has been the rule since the beginning of treaty making by the United States government. It does not infer, however, that one tribe should take to the damage and detriment of another unless the wording of the treaty is clear and convincing to that effect.

In Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1893) the United States Supreme Court held that the United States can dispose of lands underlying navigable waters just as it can dispose of other public lands. The Court said that the various colonies had followed different practices as to grants of a river bed, intending to promote commerce; that grants of land were made to them as sovereigns, and thereafter Congress had no power to grant away such lands; that a sovereign, whether a state or the United States, can change any doctrinal rule as to pas-

sage of such lands; and more particularly, that Congress has the power to make grants of lands below the high water mark of navigable waters in any Territory of the United States when it is necessary to do so to perfect an international obligation, or commerce, or to carry out other public purposes appropriate to the objects for which the United States holds the territory.

Barney v. Keokuk, 94 U.S. 324, 24 L. Ed. 224 (1876) is valuable in tracing historical development and for its recitation of McManus v. Carmichael, 3 Iowa 1, wherein the nature of the United States' grant to the "Half-breed Sac and Fox" was discussed. It held that such grant was to individual half-breeds of the Sac and Fox, rather than to a political body and "[h]ad the grant been to them as a political society, it would have been a question of boundary between nations or states, and then the line would have been the *medium filium aquae*, as it is now between Iowa and Illinois . . . . ."

▆ It is our view that the United States' cessions of 1825, 1830 and 1855 to the Choctaw and Chickasaw Nations and the United States' cessions of 1828, 1833 and 1835 to the Cherokee Nation were in truth and in fact to political bodies which were treated as independent Nations sovereign in many of their rights, and the rule announced in Barney v. Keokuk, *supra*, should be the rule for us to follow.

▆ It was stated by Chief Judge Phillips in United States v. Elliott, 131 F.2d 720 (C.A. 10, 1942) that insofar as non-navigable rivers are concerned, when the United States disposes of riparian land it may intend to restrict the conveyance to lands ending at the bank. When such intent is not shown, then if, as here, the lands were not within a state, what the grant conveys is a matter of common law principles and Supreme Court decisions.

▆ The common law and decisional rule was that a grant bounded by a non-navigable stream carried right and title to the center of the stream, unless there was a clear intention otherwise shown.

Bratschi v. Loesch, 330 Mo. 697, 51 S. W.2d 69 (1932) held that a description beginning on the bank and running the boundary line "thence down said creek" does not show an intention to place the boundary line elsewhere than at the center of the stream.

"Thence down the said river" includes land to the middle of the stream. Drake v. Russian River Land Co., 10 Cal.App. 654, 103 P. 167 (1909).

"Thence up said river" is held to extend to the center of the river. Hanlon v. Hobson, 24 Colo. 284, 51 P. 433 (1897) cites the proposition that, "in descriptions of this nature the stream is the monument, and the thread of the stream the boundary. *See* City of Denver v. Pearce, 13 Colo. 383, 22 P. 774 (1889).

Cited in Grand Rapids & Indiana RR Co. v. Butler, 159 U.S. 87, 15 S.Ct. 991, 40 L.Ed. 85 (1895), are a number of Michigan cases holding that regardless of the exact phraseology used, the common law prevailed in Michigan to the effect that a grant of land bounded by a stream carried with it the bed of the stream to the center of the thread thereof.

It seems to us from a careful reading of Choctaw v. Oklahoma, *supra*, that the Supreme Court by strong implications expressed its views as to title of the Arkansas River bed, and what is said is not mere suggestion, but amounts to a complete understanding that the tribes, the Choctaws and Chickasaws on one hand and the Cherokees on the other, acquired the river bed in fee by reason of the large tracts of land granted them for their permanent home, free of white man's interference and without government reservation of navigable rivers. Justice Marshall and the Supreme Court in this case made the following observa-

tions at 628, 629 and 630 of 397 U.S., at 1333 of 90 S.Ct.:

"Below its confluence with the Canadian, the Arkansas River forms the boundary between the land granted to the Cherokees to the north and the Choctaws to the south, and the treaties do explicitly refer to this portion of the river. In the Treaty of Doak's Stand in 1820, petitioner Choctaw Nation was granted all the land within the following boundaries:

'Beginning on the Arkansas River, *where the lower boundary line* of the Cherokees strikes the same; thence *up the Arkansas to the Canadian Fork*, and up the same to its source; thence due South to the Red River; thence down Red River, three miles below the mouth of Little River, which empties itself into Red River on the north side; thence a direct line to the beginning.' 7 Stat. 211. (Emphasis added.)

Ten years later, this grant was superseded by the Treaty of Dancing Rabbit Creek, which 'varied the description a little, and provided for a special patent,' Fleming v. McCurtain, 215 U.S. 56, 59, 30 S.Ct. 16, 17, 54 L. Ed. 88 (1909):

'*beginning near Fort Smith where the Arkansas boundary crosses the Arkansas River, running thence to the source of the Canadian fork;* . . . thence due south to Red River, and down Red River to the west boundary of the Territory of Arkansas; thence north along that line to the beginning.' 7 Stat. 333. (Emphasis added.)

And the patent issued to the Choctaw Nation in 1842 by President Tyler merely repeated the language of this latter treaty.

The Choctaw treaties preceded any grant to the Cherokee Nation; and, under them, petitioners Choctaw and Chickasaw Nations claim the entire bed of the Arkansas River between its confluence with the Canadian River and the Oklahoma-Arkansas border. The Cherokees, however, also have a claim to this part of the river, based on the language setting out the southern border of the land granted them in the Treaty of New Echota: From a point on the Canadian River,

'thence down the Canadian to the Arkansas; thence *down the Arkansas* to that point on the Arkansas where the eastern Choctaw boundary strikes said river . . . .' 7 Stat. 480. (Emphasis added.)

Moreover, they point to the patent issued them by President Van Buren in 1838, which described the southern boundary of their lands as follows:

'down the Canadian river on its north bank to its junction with Arkansas river; thence *down the main channel of Arkansas river* to the western boundary of the State of Arkansas at the northern extremity of the eastern boundary of the lands of the Choctaws on the south bank of Arkansas river. . . .' (Emphasis added.)

The above and foregoing quotations make very plain to us the inferences and conclusions to be drawn from the treaties granting fee simple title and patents to the respective Indian Nations. We note with great interest the further comment of Justice Marshall at 631 of 397 U.S., at 1334 of 90 S.Ct.:

". . . we conclude that the entire Arkansas River below its confluence with the Grand River was within the metes and bounds of the treaty grants to petitioners [Cherokees and Choctaws]. The State argues that the treaty terms 'up the Arkansas' and 'down the Arkansas' should be read to mean 'along the bank of the Arkansas River.' However, the United States was competent to say the 'north side' or 'bank' of the Arkansas River when that was what it meant . . .." (Re: Cherokee Treaty of 1817).

And we believe that if the United States had meant to assign to the Choctaw Na-

tion in the Doak's Stand Treaty of 1820 from Point Remove the north bank of the Arkansas River, the United States would have said so. The Court further stated at 631 of 397 U.S., at 1335 of 90 S.Ct.:

"This construction of the treaty term 'down the Arkansas' indicates that at the minimum the boundary of the Choctaws was also the middle of the main channel. Congress was accustomed to using the terms 'up' or 'down' the river when designating a navigable river as the boundary between States, . . . and, when it did so, the boundary was set as the middle of the main channel."

The Court further stated at 634 of 397 U.S., at 1336 of 90 S.Ct.:

"Together, petitioners were granted fee simple title to a vast tract of land through which the Arkansas River winds its course. The natural inference from those grants is that all the land within their metes and bounds was conveyed, including the banks and bed of rivers. . . . Certainly there was no express exclusion of the bed of the Arkansas River by the United States as there was to other land within the grants."

In review of the Treaties previously discussed, we make the following simple analysis:

In the Treaty of 1817 the United States granted to the Cherokee Nation a tract of land between the Arkansas River and the White River and specifically granted the Cherokees navigation rights on both rivers.

In the Treaty of 1820 the United States granted the Choctaw Nation a large tract of land lying between the Arkansas River and the Red River, and in describing this country the treaty says: beginning at a point, at the mouth of Point Remove; thence up the Arkansas River to the Canadian fork, etc. This grant did not include the river bed, and the point was only a monument or marker indicating the boundary between the

Choctaw Nation and the Cherokee Nation in Arkansas Territory.

In the 1825 Treaty the United States provided for moving the Choctaw Indians out of Arkansas Territory and relocating them west of the western Arkansas Territorial line between the Arkansas River and the Red River and paying them large annuities and other benefits. This treaty further provided that the Choctaws would cede back to the United States all their lands in Arkansas Territory.

In the 1828 Treaty between the United States and the Cherokee Nation, the Cherokees surrendered their Arkansas lands and were moved west of the western Arkansas Territorial line and were given seven million acres of land in addition to other lands. The southern boundary line of their new country was the Arkansas River, and for the first time the Arkansas River became the common boundary of the Choctaw Nation and the Cherokee Nation west of the Arkansas Territory.

The 1830 Treaty between the United States and the Choctaw Nation provided that all previous treaties inconsistent therewith were declared null and void. This treaty described the Choctaw country as: "Beginning near Fort Smith where the Arkansas boundary crosses the Arkansas River, running thence to the source of the Canadian fork . . .."

This clearly shows that the Choctaw Nation was south of the river, and the river was the common boundary between the Choctaw Nation and the Cherokee Nation. The treaty further provided that "Navigable streams shall be free to the Choctaws who shall pay no higher toll or duty than citizens of the U. S." This clearly demonstrates a right to use the river and removes any argument that the Choctaw Nation owned the river bed.

In the 1833 and 1835 Treaties between the United States and the Cherokee Nation, the Cherokee country was again de-

scribed, and the salient portion as far as we are here concerned reads as follows:

"[T]hence down the Canadian to the Arkansas; thence down the Arkansas to that point on the Arkansas where the eastern Choctaw boundary strikes said river and running thence with the western line of Arkansas Territory as now defined, to the southwest corner of Missouri; . . . ."

This would tend to place the Cherokee Nation to the south bank of the Arkansas River, and this was not the intent of the authors of the Treaty. It was intended that the Arkansas River be the southern boundary line of the Cherokee Nation and that said river be the northern boundary line of the Choctaw Nation as provided by the Treaty of 1830.

The Cherokee Patent of 1838 and the Choctaw Patent of 1842 clearly made the Arkansas River the common boundary line between the two Indian Nations. Neither was favored over the other, and the rights provided were common to each.

 We conclude that the Arkansas River bed from the Canadian fork to the Arkansas-Oklahoma boundary belonged jointly to the Choctaw Nation and to the Cherokee Nation as of the dates of the patents issued to each.

It is, therefore, our conclusion that the south portion of the Arkansas River bed from the Canadian fork to the Arkansas-Oklahoma border belongs to the plaintiffs, Choctaw Nation having an undivided ¾ interest and the Chickasaw Nation having an undivided ¼ interest; that the thread of the main channel of said river shall be the dividing line of the river bed, the south portion thereof belonging to the plaintiffs in fee simple, to the exclusion of the defendant, Cherokee Nation.

It is further concluded that the north portion of the Arkansas River bed from the Canadian fork to the Arkansas-Oklahoma border belongs to the defendant, Cherokee Nation; that the thread of the main channel of the river shall be the

dividing line of the river bed, the north portion thereof belonging to the defendant in fee simple, to the exclusion of the plaintiffs, Choctaw and Chickasaw Nations.

 The effective date of the Judgment herein shall be the 16th day of November, 1907, the date Oklahoma became a state and took control of the Arkansas River bed.

This Court will retain jurisdiction to hear and determine any further questions which might arise growing out of the jurisdictional Act of Congress which formed the basis for constituting this Court.

An appropriate Judgment will be entered herein.